## JORDAN, SECRETARY OF STATE OF CALIFORNIA, ET AL. *v.* TASHIRO ET AL.

No. 13. Argued April 13, 1928. Reargued October 9, 1928.—Decided November 19, 1928.

124

*Mr. U. S. Webb,* Attorney General of California, with whom *Messrs. Robert W. Harrison* and *Wm. F. Cleary,* Deputy Attorneys General, were on the brief, for petitioners.

*Mr. J. Marion Wright* for respondents.

MR. JUSTICE STONE delivered the opinion of the Court.

The respondents, subjects of Japan residing in California, presented for filing in the office of the Secretary of State of California, one of the petitioners, proposed articles of incorporation of the " Japanese Hospital of Los Angeles." The articles provided for the creation of a business corporation with a share capital of $100,000. They purported to authorize the corporation to construct and operate in Los Angeles a general hospital with a home for nurses and resident physicians, and to lease land for that purpose.

Although the articles complied with all provisions of the California statutes governing the organization of a corporation for such purposes, the petitioners refused to file them on the ground that, as the respondents were citizens of Japan, the Alien Land Law of the State did not permit an incorporation by them for the purposes named. The respondents then brought, in the Supreme Court of Cali-

fornia, a proceeding in mandamus to compel the petitioners to file the proposed articles and to issue a certificate of incorporation to the hospital. The mandamus petition set up that the Treaty of Commerce and Navigation between the Government of the United States and the Empire of Japan, proclaimed April 5, 1911, 37 Stat. 1504, and now in force, conferred on citizens and subjects of the Empire of Japan the right to incorporate in the United States for the purposes named in the proposed articles.

The state court granted the writ as prayed, basing its determination on the construction of the Treaty. *Tashiro v. Jordan,* 201 Cal. 236. This Court granted the petition of the Secretary of State of California for certiorari, 277 U. S. 580.

Section 2 of the Alien Land Law of California, as amended by the Act of the Legislature, approved June 20, 1923, Stats. 1923, p. 1020, provides that aliens of a class in which respondents are included may acquire, possess and enjoy real estate within the state " in the manner and to the extent, and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise." Section 3, in like terms, permits (a) acquisition of land by a corporation, the majority of whose stockholders are aliens, and (b) the purchase by aliens of stock in corporations owning or leasing land, only for purposes prescribed by such a treaty.

The statutes of California do not otherwise forbid the organizing of a corporation by citizens of Japan residing in the state, and by these enactments there was effected perfect harmony in the operation of the statute and of the Treaty. What the Treaty prescribes the statute authorizes. There is thus no possibility of conflict between the exercise of the treaty-making power of the federal government and the reserved powers of the state such as that

suggested in *Geofroy* v. *Riggs*, 133 U. S. 258, 267, on which petitioners placed reliance on the argument.

The Supreme Court of California, in passing upon the application for mandamus, granted the relief prayed, not as a matter of statutory construction, but because it thought the conduct of a hospital by Japanese citizens through the instrumentality of a corporation, organized under the laws of the state, was a privilege secured to the respondents by the Treaty which the state statute did not purport to withhold. The privilege challenged by petitioners is one specially set up or claimed under a treaty of the United States and sustained by the state court and the case is thus one within the jurisdiction of this Court conferred by § 237 (b) of the Judicial Code. Compare *Red Cross Line* v. *Atlantic Fruit Co.*, 264 U. S. 109, 120.

The question presented is one of the construction of the Treaty, the relevant portions of which are printed in the margin.[1] It in terms authorizes the citizens of Japan to carry on trade within the United States and " to lease land for residential and commercial purposes, and gen-

---

[1] Treaty of commerce and navigation between the United States and Japan.

. . . ARTICLE I. The citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established. . . .

The citizens or subjects of each of the High Contracting Parties shall receive, in the territories of the other, the most constant protection and security for their persons and property, and shall enjoy in this respect the same rights and privileges as are or may be granted to native citizens or subjects, on their submitting themselves to the conditions imposed upon the native citizens or subjects. . . .

erally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established."

The petitioners insist that the construction and operation of a hospital is not one of the purposes prescribed by the Treaty, which, it is argued, are limited so far as "trade" and "commerce" are concerned to the purchase and sale or exchange of goods and commodities, and that, in any case, the Treaty does not confer upon Japanese subjects, resident in California, the privilege of forming a corporation under the laws of California or of leasing lands through a corporate agency for such a purpose.

The principles which should control the diplomatic relations of nations, and the good faith of treaties as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. See *Geofroy* v. *Riggs, supra; Tucker* v. *Alexandroff*, 183 U. S. 424, 437; *Wright* v. *Henkel*, 190 U. S. 40, 57; *In re Ross*, 140 U. S. 453, 475. Upon like ground, where a treaty fairly admits of two constructions, one restricting the rights that may be claimed under it and the other enlarging them, the more liberal construction is to be preferred. *Asakura* v. *Seattle*, 265 U. S. 332; *Tucker* v. *Alexandroff, supra; Geofroy* v. *Riggs, supra.*

While in a narrow and restricted sense the terms "commerce," or "commercial," and "trade" may be limited to the purchase and sale or exchange of goods and commodities, they may connote, as well, other occupations and other recognized forms of business enterprise which do not necessarily involve trading in merchandise. *Asakura* v. *Seattle, supra.* And although commerce includes traffic in this narrower sense, for more than a century it has been judicially recognized that in a broad sense it

embraces every phase of commercial and business activity and intercourse. See *Gibbons* v. *Ogden*, 9 Wheat. 1, 189.

Considerations which led this Court to conclude that the terms " trade " and " commerce " as used in this Treaty do not include agriculture, and the circumstances attending the making of the Treaty which were deemed to exclude from the operation of its broad language any grant of the privilege of acquiring and using lands within the United States for agricultural purposes, were discussed in the opinions in *Terrace* v. *Thompson*, 263 U. S. 197, 223; *Webb* v. *O'Brien*, 263 U. S. 313, 323; *Frick* v. *Webb*, 263 U. S. 326, 333, and need not now be detailed. But in *Asakura* v. *Seattle, supra,* it was held that the language of this Treaty securing to Japanese citizens the privilege of carrying on trade within the United States was broad enough to comprehend all classes of business which might reasonably be embraced in the word trade, and included the privilege of carrying on the business of a pawnbroker. In *Clarke* v. *Deckebach*, 274 U. S. 392, 396, in considering the Treaty with Great Britain of July 3, 1815, 8 Stat. 228; August 6, 1827, 8 Stat. 361, granting reciprocal liberty of commerce between the United States and Great Britain, and in holding that the guarantee that " . . . the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce," did not extend to a British subject engaged in keeping a poolroom within the United States, we took occasion to point out that the language of the present Treaty with Japan was of broader scope than that then before the Court.

Giving to the terms of the Treaty, as we are required by accepted principles, a liberal rather than a narrower interpretation, we think, as the state court held, that the terms " trade " and " commerce," when used in conjunction with each other and with the grant of authority to lease land for " commercial purposes " are to be given a

broader significance than that pressed upon us, and are sufficient to include the operation of a hospital as a business undertaking; that this is a commercial purpose for which the Treaty authorizes Japanese subjects to lease lands.

It is said that the elimination from the original draft of this clause of the Treaty of words authorizing the leasing of land for "industrial, manufacturing and other lawful" purposes (see *Terrace* v. *Thompson, supra,* p. 223) leads to the conclusion that land might not be leased for hospital purposes by Japanese subjects, even though under the other provisions of the Treaty they might be permitted to operate such an institution. But as the leasing of land for a hospital is obviously not for an industrial or manufacturing purpose, this argument presupposes that the phrase "commercial purposes" is limited to merchandising businesses, which for reasons already stated we deem inadmissible. Moreover, a construction which concedes the authority of Japanese subjects to operate a hospital but would deny to them an appropriate means of controlling so much of the earth's surface as is indispensable to its operation, does not comport with a reasonable, to say nothing of a liberal, construction. The Supreme Court of California has reached a like conclusion in *State of California* v. *Tagami,* 195 Cal. 522, holding that this Treaty secured to a Japanese subject the privilege of leasing land within the state for the purpose of using and occupying it for the maintenance of a health resort and sanitarium.

The contention that the Treaty does not permit the exercise of the privileges secured by it through a corporate agency requires no extended consideration. The employment of such an agency is incidental to the exercise of the granted privilege. But it is not an incident which enlarges the privilege by annexing to the permitted business another class of business otherwise excluded from the

grant, as would have been the case in *Terrace* v. *Thompson, supra,* had the business of farming been deemed an incident to the business of trading in farm products.

The principle of liberal construction of treaties would be nullified if a grant of enumerated privileges were held not to include the use of the usual methods and instrumentalities of their exercise. Especially would this be the case where the granted privileges relate to trade and commerce and the use of land for commercial purposes. It would be difficult to select any single agency of more universal use or more generally recognized as a usual and appropriate means of carrying on commerce and trade than the business corporation. And it would, we think, be a narrow interpretation indeed which, in the absence of restrictive language, would lead to the conclusion that the Treaty had secured to citizens of Japan the privilege of engaging in a particular business, but had denied to them the privilege of conducting that business in corporate form. But here any possibility of doubt would seem to be removed by the clause which confers on citizens and subjects of the High Contracting Parties the right " . . . to do anything generally incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established."

*Affirmed.*