## COCHRANE v. UNITED STATES.

### FELLOWS v. SAME.

### Nos. 6174–6175.

Circuit Court of Appeals, Seventh Circuit.
Oct. 4, 1937.

Rehearing Denied Dec. 6, 1937.

624

Leslie G. Pefferle, of Springfield, Ill., and Roswell B. O'Harra, of Macomb, Ill., for appellant.

Howard L. Doyle, U. S. Atty., and Marks Alexander, Asst. U. S. Atty., both of Springfield, Ill.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

These appeals are from judgments wherein fines were imposed upon the court's finding the appellants guilty of vio-lating the Migratory Bird Treaty Act (16 U.S.C.A. § 703 et seq.). The informations charged that appellants did hunt unlawfully "with and by aid of corn and rye, * * wild ducks, migratory game birds included within the terms of the convention between the United States and Great Britain * * (and) contrary to the statute * *." Appellants pleaded not guilty and waived jury trials and demurred to the informations.

The demurrers challenged the constitutionality of the Migratory Bird Treaty Act because violative of the Tenth Amendment and not authorized by the treaty. The informations charge a violation of the Regulations. The Regulations are attacked because not supported, as required by statute, by findings of fact by the Secretary of Agriculture, and also because such regulations go beyond their intended scope as laid down by the statute. They therefore violate Article 1 of Section 1 of the Constitution which vests legislative powers in Congress alone and thereby forbids delegation of such powers. The statute is also challenged as invading states' powers in the matter of regulating hunting migratory birds.

The case is of importance, not only to hunters, but to the public at large. For if the appellants are successful in their attack, protection of game birds is impossible, and all migratory animals will either disappear or become increasingly rarer.

While appellants assail only certain phases of the regulations which deal with the hunting of ducks and geese, they will, if successful, strike down all Federal restrictions upon duck and geese (and other migratory bird) hunting.

The facts are few. Two game officers observed two employees of the Crane Lake Gun Club dump corn, on successive days in Horn Lake, about 150 yards from a duck blind (with fifteen to eighteen wooden decoys) occupied by appellant Cochrane and his son, and across the lake from the blind occupied by appellant Fellows. Appellants were attired for hunting and possessed shotguns and duck hunting licenses. About three per cent. of the corn floated on the surface of the water (which varied from an inch to several feet in depth). The current of the lake carried about fifteen of these kernels near appellant Cochrane's blind. While the corn was being unloaded the officers heard a gun shot and saw the ducks "flare up". There

was no evidence as to whether any ducks were killed, but there was evidence that the range of such a shotgun is one hundred yards, and the grain was dumped one hundred and fifty yards from appellant Cochrane's blind and much farther from appellant Fellows' blind.

At the time, the hunting season was open.

The questions involved are materially, if not controllably, affected by a treaty negotiated between Great Britain, the Dominion of Canada, and the United States Government (39 Stat. 1702) the essential articles of which are set forth in the margin.[1] Subsequent to the adoption of this treaty, Congress enacted the Migratory Bird Treaty Act (16 U.S.C.A. § 703 et seq.), pursuant to which the Secretary of Agriculture promulgated regulations which define migratory game birds, insectivorous birds, and migratory nongame birds. See 16 U.S.C.A. § 704.

Regulation No. 2 defines such terms as take, hunt, kill, and capture.

Regulation No. 3, for violation of which these prosecutions were begun, reads as follows:

"Regulation 3.—Means by Which Migratory Game Birds May Be Taken.

"The migratory game birds for which open seasons are specified in regulation 4 hereof may be taken during such respective open seasons with a shotgun only, not larger than no. 10 gage, fired from the shoulder, except as specifically permitted by regulations 7, 8, 9, and 10 hereof, but they shall not be taken with or by means of any automatic loading or hand-operated repeating shotgun capable of holding more than three shells, the magazine of which has not been cut off or plugged with a one-piece metal or wooden filler incapable of removal through the loading end thereof, so as to reduce the capacity of said gun to not more than three shells at one loading; they may be taken during the open season from the land or water, with the aid of a dog, and from a blind, boat, or floating craft except sinkbox (battery), powerboat, sailboat, any boat under sail, and any craft or device of any kind towed by powerboat or sailboat; but nothing herein shall permit the taking of migratory game birds from or by means, aid, or use of an automobile or aircraft of any kind.

"Waterfowl (except for propagation, scientific, or banding purposes under permit pursuant to regulations 8 and 9 of these regulations) and mourning doves are not permitted to be taken by means, aid, or use, directly or indirectly, of corn, wheat, oats, or other grain or products thereof, salt, or any kind of feed whatsoever, placed, deposited, distributed, scattered, or otherwise put out whereby such waterfowl or doves are lured, attracted, or enticed; and in the taking of waterfowl the use, directly or indirectly, of live duck or goose decoys is not permitted; nor shall anything in these regulations be deemed to permit the use of aircraft of any kind, or of a power boat, sailboat, or other floating craft or device of any kind, for the purpose of concentrating, driving, rallying, or stirring up of migratory waterfowl."

Prior to the enactment of the treaty above referred to, there was doubt and un-

[1] "Article II

"The high contracting powers agree that, as an effective means of preserving migratory birds, there shall be established the following close seasons during which no hunting shall be done except for scientific or propagating purposes under permits issued by proper authorities.

"1. The close season on migratory game birds shall be between March 10 and September 1, except that the close season on the Limicolae or shorebirds in the Maritime Provinces of Canada and in those States of the United States bordering on the Atlantic Ocean which are situated wholly or in part north of Chesapeake Bay shall be between February 1 and August 15, and that Indians may take at any time scoters for food but not for sale. The season for hunting shall be further restricted to such period not exceeding 3½ months as the high contracting powers may severally deem appropriate and define by law or regulation.

"2. The close season on migratory insectivorous birds shall continue throughout the year.

"3. The close season on other migratory nongame birds shall continue throughout the year, except that Eskimos and Indians may take at any season auks, auklets, guillemots, murres, and puffins, and their eggs, for food and their skins for clothing, but the birds and eggs so taken shall not be sold or offered for sale."

"Article VIII

"The high contracting powers agree themselves to take, or propose to their respective appropriate law-making bodies, the necessary measures for insuring the execution of the present convention."

626

certainty as to the power of Congress to deal with the hunting and killing of migratory game birds. U. S. v. Shauver (D. C.) 214 F. 154; U. S. v. McCullagh (D.C.) 221 F. 288. These two decisions denied to Congress the power so to legislate.

Subsequently, the Supreme Court definitely settled all questions as to validity of the treaty and the first act of Congress enacted pursuant to the treaty. Both were upheld. State of Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 383, 64 L.Ed. 641, 11 A.L.R. 984; Carey v. South Dakota, 250 U.S. 118, 39 S.Ct. 403, 404, 63 L.Ed. 886.

In the Holland Case, the court said:

"It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, 'a power which must belong to and somewhere reside in every civilized government' is not to be found. Andrews v. Andrews, 188 U.S. 14, 33, 23 S.Ct. 237, 47 L.Ed. 366. What was said in that case with regard to the powers of the States applies with equal force to the powers of the nation in cases where the States individually are incompetent to act. We are not yet discussing the particular case before us but only are considering the validity of the test proposed. With regard to that we may add that when we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago. The treaty in question does not contravene any prohibitory words to be found in the Constitution. The only question is whether it is forbidden by some invisible radiation from the general terms of the Tenth Amendment. We must consider what this country has become in deciding what that amendment has reserved.

"The State as we have intimated founds its claim of exclusive authority upon an assertion of title to migratory birds, an assertion that is embodied in statute. No doubt it is true that as between a State and its inhabitants the State may regulate the killing and sale of such birds, but it does not follow that its authority is exclusive of paramount powers. To put the claim of the State upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership. The whole foundation of the State's rights is the presence within their jurisdiction of birds that yesterday had not arrived, tomorrow may be in another State and in a week a thousand miles away. If we are to be accurate we cannot put the case of the State upon higher ground than that the treaty deals with creatures that for the moment are within the state borders, that it must be carried out by officers of the United States within the same territory, and that but for the treaty the State would be free to regulate this subject itself."

With the validity of the treaty and the validity of certain legislation enacted pursuant thereto settled, the scope of the controverted question in the instant cases is greatly narrowed.

Is the legislation before us within the legitimate scope of the treaty covenants? Are the Regulations of the Secretary of Agriculture valid?

Appellants argue that the treaty authorized only such legislation as defined or limited the close season period for hunting and did not deal with the number of birds that might be killed in a day or how the sportsman might hunt the birds during the open season.

Without discussing the question at length or elaborating our reasons therefor, we will content ourselves with merely expressing our conclusions.

In our opinion the authority to deprive the hunters of *any* open season carries with it the power to provide for a limited open season *for limited purposes only*. In other words, in a case such as we have before us, the greater power necessarily carries with it the lesser power.

If Congress may prohibit duck and geese shooting entirely, it follows that the same authority may provide for a short open season, but limit the number of game birds a hunter may kill in a day, as well as prohibit the use of lures to attract birds to hunters' blinds and also may pre-

scribe the guns or other instruments which the hunter may use to kill the birds.

■ We are likewise persuaded, in view of the decisions of the Supreme Court since the announcement of the two District Court decisions above cited, that Congress may lawfully legislate, under the Commerce Clause of the Constitution (article 1, § 8, cl. 3), to protect the game, nongame, and insectivorous birds which migrate with the changing seasons.

In Carey v. South Dakota, supra, the court recognized the power of a state to enact legislation to protect migratory birds *in the absence of Federal legislation* "although it incidentally affected interstate commerce."

In the case of Thornton v. United States, 271 U.S. 414, 415, 46 S.Ct. 585, 586, 588, 70 L.Ed. 1013, the court held that as to cattle ranging about and passing back and forth from one state to another, their passage from state to state could not "be differentiated from interstate commerce."

Passing the dissimilarities between wandering cattle and migratory birds, the more distinctive of which are that the latter are not possessed or capable of being possessed and are non-identifiable, and, looking to the factors which are determinative of interstate commerce, the Thornton Case is not readily distinguishable.

It is impossible to deal with migratory birds on the basis of their being property of the state or of the state's having an exclusive property interest in them. Ordinarily an attribute of property and of property rights is possession. It is obviously impossible to reduce the property rights in migratory birds to possession. Moreover, it is equally impossible even to identify the birds after they have passed from one state into another and returned to the state where they were hatched. It is unbelievable that the framers of the Constitution intended to leave this form of valuable property, which did not vest in the individual and which could not be controlled by the state, unprotected and fated to total destruction. It is not a matter of sentiment but of common sense. As the Court said in the Holland Case:

"Here a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power. The subject matter is only transitorily within the State and has no permanent habitat therein. But for the treaty and the statute there soon might be no birds for any powers to deal with. We see nothing in the Constitution that compels the Government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed. It is not sufficient to rely upon the States. The reliance is vain, and were it otherwise, the question is whether the United States is forbidden to act. We are of opinion that the treaty and statute must be upheld. Carey v. South Dakota, 250 U.S. 118, 39 S.Ct. 403, 63 L. Ed. 886."

Our conclusion therefore is that the legislation was authorized by the Commerce Clause, as well as by the treaty. If we are correct in this conclusion, the asserted limitations of the treaty may well be ignored for they offer no bar to the legislation as an act whose object is to regulate interstate commerce. However, the decision is placed on both grounds.

On the subject of delegating to the Secretary of Agriculture the power to promulgate regulations, the case is governed by Thornton v. United States, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563.

Appellants' assignment of error which challenges the sufficiency of the evidence to support the finding of guilt will be dealt with briefly.

■ The evidence without contradiction showed appellants were in hunting clothes, and possessed of shotguns. They were in blinds used by hunters when "duck shooting." A shotgun was fired; whereupon ducks arose from the pond near said blind.

Both appellants were members of the Crane Lake Gun Club which owned swamp land around Crane Lake, a body of water comprising 700 acres and which was "used exclusively as a resting ground for wild ducks and no shooting or hunting was permitted by the Club on Crane Lake." Adjacent to and connected by water with Crane Lake was Horn Lake. The blinds were on Horn Lake and the members of the Club shot from blinds on said lake. Shortly before the shot in question, witnesses saw employees of the Gun Club dump corn into the water of Horn Lake and about 150 yards from the blinds. At this place the water varied in depth from two inches to three or four feet. In the

628

course of an hour the corn floated in and about wooden decoys which were placed a short distance in front of the blinds.

In our opinion this evidence established a violation of the second paragraph of Regulation 3.

It is unnecessary for us to define the limits of this section inasmuch as the facts in the instant cases fall clearly within it on any reasonable construction of it.

■ We do not understand that this regulation prohibits placing of corn, wheat, oats or other grain or any other kind of feed whatsoever into rivers, lakes or ponds to induce and entice water fowl to take a certain route in their migration. It is not the feeding of the birds that is condemned but rather the feeding of them in such a way as to lure them close to a blind wherein hunters are lodged that is prohibited.

■ Clearly any regulation which is destructive rather than promotive of wild game life would be void. Equally clear, we think, is the legislative intent to permit duck and geese hunting. But the length of the open season, the kind and character of the gun which the hunters might use, the methods adopted by hunters to lure the birds,— all were the legitimate subject-matters of this and the other regulations. Naturally much was left to the administrative officer who was charged with the enforcement of the law, the protection of the birds, and the regulation of duck hunting. His action in turn is and must be dependent upon past experiences, the statistics dealing with the plentifulness of ducks and geese and other migratory birds, and finally, but not least, upon the sportsmen themselves and the code of ethics which they promulgate and enforce.

The judgments are
Affirmed.