**CERRITOS GUN CLUB et al. v. HALL et al.**

No. 8480.

Circuit Court of Appeals, Ninth Circuit.

April 15, 1938.

Newlin & Ashburn, of Los Angeles, Cal. (Gurney E. Newlin, C. Hudson, B. Cox, and Robert P. Hastings, all of Los Angeles, Cal., of counsel), for appellants.

Peirson M. Hall, U. S. Atty., and Robert L. Hanley and M. G. Gallaher, Asst. U. S. Attys., all of Los Angeles, Cal., for appellees.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a decree dismissing without leave to amend the bill of appellant, a membership corporation, and three corporations, owners of land in Southern California improved for migratory wild fowl hunting, seeking equitable relief for the protection of the value of their investments, by enjoining appellees, federal officers, from prosecuting them for luring, with grain, migratory game fowl to their properties, there to be shot by their stockholders and members.

The following questions are presented:

A. Under the rule controlling in Panama Refining Co. v. Ryan, 293 U.S. 388, 414, 55 S.Ct. 241, 245, 79 L.Ed. 446, are appellants, owners of wild fowl preserves, threatened with prosecutions for conspiring to aid hunters by baiting such preserves, contrary to the regulation of the Secretary of Agriculture, made pursuant to the Migratory Bird Treaty Act, as amended, 16 U.S.C.A. §§ 703–711, which prosecutions will destroy more than $3,000 in value of each preserve, entitled to claim injunctive relief for the protection from the destruction of such values, on the ground of the invalidity of the act and regulation?

B. Are migratory wild fowl, owned by the states, capable of domestication and possession, and in many instances so domesticated and possessed, like grazing cattle, wandering from state to state, in interstate commerce as they cross state boundary lines, and hence subject to congressional regulation?

C. Is the Migratory Bird Treaty Act and regulation prohibiting luring the birds by baiting, authorized by the provision of the Convention for shortening the season for hunting?

D. Is the regulation forbidding baiting invalid as a delegation of legislative power?

E. Is the regulation, with its criminal sanction, invalid because too vague and uncertain to advise the offender of the offense?

A. *Appellants' bill gives them standing here to urge the invalidity of the act and regulation.*

Among the averments of the bill, which the dismissal requires us to accept as true, are that each appellant owner of land in Southern California, otherwise of little

value, at great expense, from $5,000 to $150,000, has watered and otherwise developed it as a habitat for such migratory game and erected thereon building accommodations for its hunting members and stockholders, and that these enterprises of affording and furnishing such accommodations and opportunity to hunt are made possible of accomplishment only by luring and keeping the migratory game there, through distributing over the premises barley grain upon which the birds can subsist. It is alleged that the value of the investments will be totally destroyed if the appellants legally may be prosecuted under the challenged regulation and act.

Appellants admitted at the hearing that many of the flocks of ducks and geese, in the absence of the watered areas and the lure of feed provided, would not stop at the otherwise barren areas of appellants' properties, but would continue to the vast expanse of the little inhabited waters and marshes of the lower Colorado river and the Gulf of Lower California.

It is urged that the feeding saves more ducks from starvation than are killed by luring them to the hunters. Obviously, if there is ground for such a contention, it is relevant only to a proposal for a modification of the regulation or of the law itself.

The court also takes judicial notice of the existence in the state of California of a large number of such hunting enterprises as those of appellants. The heavy capital investments in such enterprises as the bill alleges, are, in the absence of prohibitive game laws, entirely legal. They create property rights which receive the protection of federal and state courts from those illegally interfering with and frustrating the enterprises which give the property rights their value.

It is obvious that the value of appellants' investments will be totally destroyed if, as alleged, their occupants and users will cease to use them unless the duck clubs bait the premises to lure the game there. The damage alleged exceeds the jurisdictional amount, and the threatened prosecution, if made, will directly and immediately destroy the only value in use which the investments have.

Appellants are not here seeking to protect the rights of the hunters to shoot game so lured. They are seeking equitable relief to prevent the loss of their property values if they themselves are prosecuted for their own acts of baiting the birds,

to make valuable their property. That such baiting in aid of hunters violating the act and regulation is a criminal offense by appellants if the act and regulation be valid, is apparent.

The regulation, coupled with its punitive provisions, makes criminal the shooting of migratory game lured by grain "directly or indirectly" to the hunter.

"Waterfowl (except for propagation, scientific, or banding purposes under permit pursuant to regulations 8 and 9 of these regulations) and mourning doves are not permitted to be taken by means, aid, or use, directly or indirectly, of corn, wheat, oats, or other grain or products thereof, salt, or any kind of feed whatsoever, placed, deposited, distributed, scattered, or otherwise put out whereby such waterfowl or doves are lured, attracted or enticed. * * *"

Hence, if the regulation be warranted, each *appellant,* in maintaining the value of its property by feeding wild fowl, will be an accessory principal under 18 U.S.C.A. § 550 to the offense of each hunting member for each duck or goose of the hundreds or thousands so lured and shot in a season, and a member of a conspiracy to violate the regulation.

The bill alleges that the respondents, as federal enforcing officers, will prosecute appellants for these claimed offenses. Since the appellants' investments and enterprises continue to have their value only if the acts prohibited by the regulation are repeated, hundreds and perhaps thousands of times in a season, it is apparent that, if the regulation be invalid, *appellants'* property values will be destroyed, since they will be harassed by a multiplicity of unwarranted prosecutions for crimes charged against *them,* all presenting the identical issue of the validity of the regulation here presented.

Their situation is pertinently analogous to that of the oil producers whose enterprises were threatened with a similar multiplicity of prosecutions under the penalties for violating the regulations under section 9(c) of the National Industrial Recovery Act, 15 U.S.C.A. § 709(c); in the case of Panama Refining Co. v. Ryan, 293 U.S. 388, 414, 55 S.Ct. 241, 246, 79 L.Ed. 446. The Supreme Court there held that the repeated prosecutions warranted the consideration of the constitutionality of the act under which they were claimed to be authorized.

"The statute provides that any violation of any order of the President issued under section 9(c) [15 U.S.C.A. § 709(c)] shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both. We think that these penalties would attach to each violation, and *in this view the plaintiffs were entitled to invoke the equitable jurisdiction to restrain enforcement, if the statute and the executive orders were found to be invalid.* Philadelphia Co. v. Stimson, 223 U.S. 605, 620, 621, 32 S.Ct. 340, 56 L.Ed. 570; Terrace v. Thompson, 263 U.S. 197, 214–216, 44 S.Ct. 15, 17, 18, 68 L.Ed. 255; Hygrade Provision Co. v. Sherman, 266 U.S. 497, 499, 500, 45 S.Ct. 141, 69 L.Ed. 402." (Italics supplied.)

In a well-considered case brought by a Massachusetts corporation against citizens of North Carolina, the Fourth Circuit granted an injunction to a duck club which has a similar investment in hunting lodges, etc., against the repeated and threatened trespasses of poachers. Swan Island Club v. Ansell, 51 F.2d 337–340. The ground of the equitable jurisdiction exercised by the court was the destruction of the value of the investment in the hunting properties in excess of $3,000. The enjoined acts are held directly to destroy the property values. It is irrelevant to the question of equity jurisdiction that in that case the threatened destruction of property values is caused by repeated trespasses and here by repeated prosecutions. The prevention of the loss of property value is the equitable relief sought, not the personal right to be free of prosecution, just as in the Panama Refining Case, supra.

It is also irrelevant that in baiting the property for hunting, the alleged sole use for which the properties were created and for which alone they have value, no law of the state of California is broken. Such sole use of the property in aid of hunting thereon is a crime under the challenged federal law. As said, it is either a conspiracy to defeat the regulation or an accessory principal crime, or both, for which appellees admit they intend to prosecute appellants. In this respect Judge Healy's opinion seems to be based on the theory that appellants' acts constitute no crime, and hence no prosecutions are warranted. On the contrary, the brief of the government's officers insists that they are entitled to and will prosecute. Since the federal officers are threatening appellants with prosecutions under the Migratory Bird Treaty Act for the acts described in the bill, if, as Judge Healy construes them, these acts *do not describe an offense,* then a fortiori are appellants entitled to their injunction.

Nor is relevant the illustration of the sporting goods dealer, who will sell less 10-guage guns if shooting certain game with such guns is prohibited. The dealer commits no crime if he holds such guns in his stock. But suppose the dealer acquired his stock of 10-guage guns under understandings with a hundred associated customers that he was to supply each with a gun to hunt in a manner in violation of the challenged law, and for these conspiracies was actually threatened with prosecutions by the law enforcing officers? Could it be said that the threatened prosecutions did not directly destroy such value of his business venture and, if the destruction exceeded $3,000, that he was not entitled to receive federal equitable protection on showing the law to be unconstitutional?

Or suppose just as the sole valuable use of real estate is criminal and the owners are actually threatened with prosecution, the manufacture or possession of each of such guns were a federal crime for which the manufacturer or dealer is threatened with prosecution? Could it be said that one having a plant for their manufacture or a stock in trade for sale could not invoke equitable protection under the principle of the Panama Refining Case, if damaged in excess of $3,000 by repeated prosecutions for each gun manufactured or sold? In all such cases the prosecutions of the property owner for *his* alleged crime in using *his* property, destroy its value just as in the Panama Refining Case.

Hence we hold, under the authority of the cited cases, that appellants are warranted to seek here injunctive relief for the protection of their properties from respondents' threatened repeated action.

B. *The migratory wild fowl are owned by the states, are capable of domestication and are domesticated and possessed, and, like grazing cattle wandering from one state to another, are in interstate commerce at they move across state boundary lines. The commerce clause supports the act and the regulation.*

The duck clubs' briefs urge, first, that there is no constitutional warrant for the legislation. In reply the government officers claim that, whether or not the con-

vention in conferring the specific power to fix the *time* [1] of a season, also confers the power to determine the *manner* or *means* of hunting, such as luring by baiting, the commerce clause of the Constitution, art. 1, § 8, cl. 3, does confer on Congress such power over the manner and means of killing migratory wild fowl. The Seventh Circuit holds that Congress has such power. Cochrane v. U. S., 92 F.2d 623.

■ We do not agree with the dictum of that case that bringing the line of flight of wild fowl by baiting to a hunting territory is not "indirectly" a "luring" within the meaning of the regulation.

We believe the appellants have violated the Secretary's regulation whether by pursuing the indirect method of baiting before the season opens to keep the birds there to be shot after the season opens, so that hunters may flush them as they walk or punt over the preserves, or by directly placing the grain in front of the blinds or stands during the season. Wherever the grain is placed on the preserves, the wind will create lines of the birds' flight, to and from it, which will aid the slaughter from blinds located for the purpose.

We are fully in accord with Judge Evans' opinion and the government's contention that these birds may be regulated by Congress as subjects of interstate commerce. What follows is a more detailed consideration of their character and legal status which aims to fortify the conclusion reached by his circuit.

■ The word "commerce" in the constitutional grant to Congress for its regulation is not confined to transactions involving the sale or transport of goods. Nor is it confined to persons traveling from one state to another or between the United States and foreign countries. Nor to constitute commerce need any physical thing reduced to possession move between states. The agitation of radio waves in nonprofit conversations, transmitted between the persons in the sovereignty of one state to those in another, constitutes interstate commerce. Federal Radio Comm. v. Nelson Bros. Bond & Mtg. Co., 289 U.S. 266, 279, 53 S.Ct. 627, 633, 77 L.Ed. 1166. Such commerce also includes cattle traveling across state boundaries following their natural instinct in ranging for food. Thornton v. U. S., 271 U.S. 414, 425, 46 S.Ct. 585, 588, 70 L.Ed. 1013.

Whether the factors incident to the intercourse held "commerce" in nonproperty owning nonprofit radio communication, and the instinctively ranging cattle are analogous to those incident to the intercourse of these migratory fowl, requires a statement of our judicial knowledge of their nature, habits, domesticability, and the gradual development of their actual possession by their owners. Naturalists and the public at large have learned much about the habits and the actual and possible domestication of these migratory fowl since Mr. Justice Holmes wrote the opinion in Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L. Ed. 641, 11 A.L.R. 984. On the knowledge so gained have followed state and federal legislation regulating their domestication and possession.

■ Judicial notice is taken of the great distances covered in their northerly and southerly migrations. Their breeding grounds are at the northern end of the migration, whither they fly in the spring to rear their young. Many breed in Alaska, and those not shot on their southerly flight in British Columbia, the United States, and the northwestern boundaries of Mexico, return to their birthplaces. Other large numbers are bred in Canada and fly south to winter in the central and southern states of the United States and in the Gulf of Mexico and Gulf of Lower California. Others breed in nearly all the states of the Union. Many of the same species are found to breed in all these areas.

In the settlement of the Western and Southern States, with its reclamation of marsh lands for agricultural and other purposes, the natural habitat of the birds in the United States has been greatly diminished, creating a concentration for hunting in the remaining watered areas. One of the principal methods of luring of birds into special areas to be hunted is the feeding of those areas, and such feeding, whether it be in front of a particular blind or by scattering over a wider area, either "directly or indirectly," within the terms of the consid-

---

[1] "The closed season on migratory game birds shall be between March 10 and September 1. * * * The season for hunting shall be further restricted to such period not exceeding three and one-half months as the high contracting parties may severally deem appropriate and define by law or regulation." Article 2, § 1, 39 Stat. 1703.

ered regulation, contributes greatly to the slaughter of their constantly diminishing quantity.

Despite the increase in urban population and occupation, the number of hunters in the United States is very large. How powerfully survives the strong instinct and desire of human beings to hunt and reduce to possession and food such migratory birds and other wild creatures is evidenced by the fact that over 225,000 licenses are annually issued to and paid for by hunters in California alone. How rapidly the number of migratory water fowl is progressing towards extinction has been declared by the Supreme Court in a case sustaining the Migratory Bird Treaty between the United States and Canada. Missouri v. Holland, 252 U.S. 416, 435, 40 S.Ct. 382, 384, 64 L.Ed. 641, 11 A.L.R. 984.

With the reduction in their former countless numbers, federal and state governments have set aside areas for their nesting and reproduction and for their protection from hunters. They are more and more being trapped and held in great cages for their breeding and sale. In public lakes and marshes of city parks they are captured and their wings clipped, thus reducing them to "property in possession" in the fullest meaning of that term, just as cattle are property in possession.

These geese and ducks are easily subject to domestication. Naturalists and private citizens relate many examples, unimpeachably verified, such as that of the Canada geese presented to a nationally known jurist, who had them wing-clipped and inclosed on his farm in Pennsylvania in a small yard with a puddle, and fed them in an adjoining barn. When their wings grew out, they were permitted to continue on their northern flight and yet returned with other companions to their former owner for several successive Octobers. Though their fence and puddle were gone, they alighted where they had formerly been inclosed, were driven into the barn for feeding, continued their visits for several days, and went on with their flights.

Citizens in California parks see hundreds of wild duck of all varieties, and all free winged, on foot and in the air swarming up and crowding one another to reach the barley in cans held by park attendants. The bands on these birds show their flights from Alaska to the north and Salt Lake to the east.

A recent moving picture run in Washington, D. C., before the President, and later before many others, shows the wild mallard more immediately domesticable than the wolf or hyena has been in his transit to the dog. A cock chick was taken from his nest on Lake Malheur, hand fed and raised in the library of the home. Full fledged he is filmed sleeping between an Irish setter's legs, in play teasing him by pulling his whiskers, and taking his exercise outdoors in a stroll at the heels of his master.

Not only is the possession of wild ducks and geese for reproduction becoming common, but industries based upon it are regulated by state and federal law; e.g. 16 U. S.C.A. § 671, et seq.; California Fish & Game Act, Deering's Gen.Laws, Vol. 1, Act 2875, § 4. It is entirely conceivable that if the extermination continues, as recognized as likely by the Supreme Court, large numbers of these duck, resting on their northerly flight in such great preserves as Malheur Lake in Oregon, will be trapped, their wings clipped, and their mating and breeding compelled there by such stoppage in transit on their way to Washington and Canada. If their offspring be released in the fall without wing clipping, their instinct will take them south, and by this repeated process prevent many of them ever reaching their ancestors' more northern spring destination.

Certainly, when we consider the history of the myriads of carrier pigeons and the countless buffalo traveling north and south between the states and Canada, and the disappearance of the former, and the *breeding in enclosed captivity* of the latter, it is no "fanciful conjecture" (Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281) that the Congress may rationally entertain the anticipation of a similar fate to migratory waterfowl. Adkins v. Children's Hospital, 261 U.S. 525, 544, 43 S.Ct. 394, 396, 67 L. Ed. 785, 24 A.L.R. 1238; Ogden v. Saunders, 12 Wheat. 213, 270, 6 L.Ed. 606.

The Thornton Case, supra, in which the movement of cattle ranging for food is held to be subject to regulation in interstate commerce, is not based upon the sale of the cattle in the state to which they have ranged. Non constat that all the cattle returning to the state from which they have traveled are slaughtered and eaten within the state, nevertheless this intercourse is

commerce. It is the traveling of the animals following their instinct to range which constitutes the interstate character of their movements.

Like the cattle in the Thornton Case, these traveling birds are subject to ownership. It is the ownership of the people of the state in their collective sovereign capacity. The Supreme Court has determined its character in language too plain to be controverted. After reviewing the Roman law in which the court finds that creatures ferae naturae were considered belonging *in common* to all the citizens of the state and Pothier's disagreement under the doctrine of natural law, and Blackstone's assertion that animals ferae naturae are prerogative property vested in the king alone, the Supreme Court defines the property right as being in the people of the state in their sovereign capacity, as follows:

"While the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the state, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good. Therefore, for the purpose of exercising this power, the State, as held by this court in Martin v. Waddell, 16 Pet. 367, 410 [10 L. Ed. 997], represents its people, and the ownership is that of the people in their united sovereignty. The common ownership, and its resulting responsibility in the state, is thus stated in a well-considered opinion of the supreme court of California:

" 'The wild game within a state belongs to the people in their collective sovereign capacity. It is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or traffic and commerce in it, if it is deemed necessary for the protection or preservation of the public good.' Ex parte Maier, supra [103 Cal. 476, 37 P. 402, 42 Am.St.Rep. 129].

"The same view has been expressed by the supreme court of Minnesota, as follows:

" 'We take it to be the correct doctrine in this country that the ownership of wild animals, so far as they are capable of ownership, is in the state, not as a proprietor, but in its sovereign capacity, as the representative and for the benefit of all its people in common.' State v. Rodman, supra [58 Minn. 393, 59 N.W. 1098].

"The foregoing analysis of the principles upon which alone rests the right of an individual to acquire a qualified ownership in game, and the power of the state, deduced therefrom, to control such ownership for the common benefit, clearly demonstrates the validity of the statute of the state of Connecticut here in controversy. The sole consequence of the provision forbidding the transportation of game killed within the state, beyond the state, is to confine the use of such game to those who own it,—the people of that state."

Geer v. Connecticut, 161 U.S. 519, 529, 16 S.Ct. 600, 604, 40 L.Ed. 793.

Not only is there common ownership in the people of the states, with the owners' incident right to possession, but already, as we have shown, increasing actual possession. Though of a kind peculiar to their wandering natures, we find their actual domestication.

The language of the Supreme Court holding that the ranging of cattle across state lines made their interstate intercourse "commerce," as that term is used in the pertinent section of the Constitution, is: "But it is said that these cattle do not appear to have been intended to be transported by rail or boat from one state to another, and this only is interstate commerce in cattle under the Constitution. They were on the line between the two states. To drive them across the line would be interstate commerce, and the act of 1905 [21 U.S.C.A. § 123 et seq.] expressly prohibits driving them on foot when carrying contagion. It is argued, however, that when the cattle only range across the line between the states, and are not transported or driven, their passage is not interstate commerce. We do not think that such passage by ranging can be differentiated from interstate commerce. *It is intercourse between states, made possible by the failure of owners to restrict their ranging, and is due, therefore, to the will of their owners.*" (Italics supplied.) Thornton v. U. S., 271 U.S. 414, 425, 46 S. Ct. 585, 588, 70 L.Ed. 1013.

We have found that it is not a "fanciful conjecture" but a concept rationally to be accepted by Congress, as the basis of

their legislation, that the states may conclude to hold large numbers of these birds within their own territorial confines and thus by "the will of their owners" "restrict their ranging" flight.

There is one incident in the ownership of these birds in their interstate and foreign intercourse, as they cross state and national boundary lines, differing from that in the *ordinary* case of wandering cattle. The ownership of the wild fowl ceases in the state of departure and is established in the state next visited during the period of visitation. By the birds' instinct it is moved from one ownership to another to return later to the first.

Ordinarily, of course, this change of title does not occur with cattle. However, it could not be contended that it was not a transaction in interstate commerce if owners of land on each side of a state boundary agreed that as soon as any cow or steer of one ranged onto the lands of the other, the ownership of the former ended and that of the latter began. Change of ownership on crossing the state line would not affect the interstate character of the cattle's ranging. The Supreme Court held, in an opinion as recent as March 28, 1938, that canned goods sold to a purchaser without the state, to whom the title is transferred at shipment at the plant of manufacture, are none the less in interstate commerce when shipped. Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 58 S.Ct. 656, 82 L.Ed. ——.

As we have seen, interstate intercourse is commerce in the sense here controlling, although not only no question of change of ownership is involved, but also where there passes no material thing owned by any one—such as the thoughts expressed in speech in an interstate radio phone conversation.

■ It is, therefore, a regulation of commerce to prohibit the killing of wild ducks and geese in their interstate or foreign migration by luring them either directly or indirectly to the guns of their hunters.

■ That the Migratory Bird Treaty Act may be construed as intending to cover "other purposes" than those accomplishable by the exercise of powers given Congress by the Convention is apparent both from its title and provisions. The title provides: "An act to give effect to the convention between the United States and Great Britain for the protection of migratory birds concluded at Washington, August sixteenth, nineteen hundred and sixteen, *and for other purposes.*" (Italics supplied).

Since the only subject preceding the words "for other purposes" is "to give effect to the convention," the other purposes can mean only purposes other than giving it such effect. There is no room for applying the doctrine of ejusdem generis, but, if there were, the only general preceding subject is the "protection" of game.

When we consider that the treaty provision, "The closed season on migratory game birds shall be between March 10 and September 1. * * * The season for hunting shall be further restricted to such period not exceeding three and one-half months as the high contracting parties may severally deem appropriate and define by law or regulation," mentions only the matter of the *time* of hunting and specifically, permits only the shortening of the previously fixed hunting season, the provision of section 2 of the act, as amended, 16 U.S.C.A. § 703, distinguishing between "time" and "manner," demonstrates what "other purposes" Congress had in mind. That provision is: "Unless and except as permitted by regulations made as hereinafter provided, it shall be unlawful to hunt, take, capture, kill, * * * at any *time or* in any *manner,* any migratory bird, included in the terms of the convention." (Italics supplied.)

The broader "purposes" of the makers of the convention, as distinguished from its narrowing "provisions," are expressed in its preamble as: "The saving from indiscriminate slaughter" and "insuring the preservation of such migratory birds as are either useful to man or harmless."

Section 3 of the act, as amended, 16 U.S.C.A. § 704 and note, makes provision to "carry out" the "purposes" of the convention of the saving the birds from slaughter by authorizing regulations of other matters than the specific treaty provision for the time or season for hunting. It provides: "*subject* to the *provisions* and in order to *carry out* the *purposes* of the convention, the Secretary of Agriculture is authorized and directed, from time to time, having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such

birds, to *determine* when, *to what extent,* if at all, and by *what means,* it is compatible with the terms of the convention to allow hunting, taking, capture, killing, * * * and to adopt suitable regulations permitting and governing the same, in accordance with such determinations which regulations shall become effective when approved by the President."

Here again Congress provides not only for the "extent, if at all" to "allow hunting," but also the "means" of "taking, capture, killing," the migratory fowl. Such "means" are "compatible with the terms of the convention" limiting the *"time"* of hunting, for they are not only not derogatory to it, but, on the contrary, also carry out the purposes of the convention preamble.

It therefore appears that Congress intended to invoke its own powers to accomplish other purposes than those enabled by the treaty, and that it has done so.

C. *The act and regulation are supported by the convention.*

 The government officers contend that while the act is intended and receives support in the commerce clause, it also is supported by the Convention itself.

The duck club's argument against such an effect of the treaty is that its restriction "to such period not exceeding three and one-half months" refers solely to a period of *time,* and that creating a *time* limitation of the "closed season" *is the* only *power* conferred on the United States by the treaty *provision,* as distinguished from the broader general *purposes* of the treaty's preamble, i. e., the desirability of prevention of slaughter and extinction of the fowl, however it may be accomplished.

A recasting of this argument is that where there is in the preamble a general declaration of purposes sufficient to warrant *any* action to prevent the slaughter of migratory fowl, the confining of the parties to the convention to the specific single act of shortening the time of a fixed season, must be interpreted to mean that specific time excludes any of the various other methods of preventing slaughter. Expressio unius est exclusio alterius.

Continuing, it is argued that it is not reasonable to believe that the negotiators of the Convention were ignorant of all the other regulatory devices to prevent the slaughter, such as are authorized by the Migratory Bird Treaty Act. If Mr. Lansing and Sir Cecil Spring Rice had desired to authorize them, they would have drawn the challenged clause to read: "The season for hunting shall be further restricted to such period not exceeding three and one-half months [and the slaughter of the game be otherwise prevented] as the high contracting powers may severally deem appropriate and define by law or regulation."

The strength of this argument is enhanced when we consider that in California feeding grain begins weeks before the shooting season, to lure on the earlier arriving birds, so they will stay on the artificially watered areas until into the shooting period. Did the writers of the treaty consider baiting, before or during the season, a shortening of the time of the season?

Also, it is argued that treaties should not so be construed that they give to the Congress powers over matters otherwise not in its control or solely in control of the states, unless the intent to do so is clearly apparent. It is suggested that the National Industrial Recovery Act, 48 Stat. 195, held unconstitutional in Schechter Poultry Corp. v. U. S., 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, could become effective by a treaty with Lithuania.

It is an answer to these arguments that the word "season" in the treaty provision, article 2, section 1, supra, means, in addition to a *time* limited season, also a *hunter* limited season. That is to say, that Congress may enact a time limited season or no season at all *for a hunter luring his game by baiting.*

It is true that what we are concerned with is a regulation claimed to create a criminal offense, for which the appellants are seeking to prevent prosecution, and that *as such* it must be construed strictly in favor of the threatened criminal.

However, it seems to us that we are primarily concerned here with the treaty as an authoritative basis for the regulation, whether criminal or otherwise. The prevention of baiting will enable more birds to return to Canada. To prevent it would give liberality of interpretation in favor of the treaty nation other than that of the court. Asakura v. Seattle, 265 U.S. 332, 342, 44 S.Ct. 515, 516, 68 L.Ed. 1041; Jordan v. Tashiro, 278 U.S. 123, 127, 49 S. Ct. 47, 48, 73 L.Ed. 214; Factor v. Laubenheimer, 290 U.S. 276, 293, 54 S.Ct. 191,

195, 78 L.Ed. 315. It is true that in accepting such interpretation liberality is pressed to the extreme, though, it is hoped, not casuistically beyond. It finds support in the opinion of the Seventh Circuit in Cochrane v. U. S., supra.

■ It is reasonable to suppose that because such an interpretation of the treaty is not in the realm of obvious certitude, and has not been considered by the Supreme Court, the support of the commerce clause as warranting the act is so strongly pressed by the government's officers. It is for that reason it is first considered in the opinion, since we are commanded and controlled by the principle enunciated in Ogden v. Saunders, 12 Wheat. 213, 269, 270, 6 L.Ed. 606, that: "It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt."

D. *The making of the regulation against baiting is not a delegation of legislative power.*

■ Appellants contend that the regulation violates the principle established in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, that the delegation of the power to regulate by the executive and administrative officers is valid only if the policy under which the regulation is to be made is determined by the Congress.

With this we cannot agree. The policy of the act is determined by section 3 of the act itself, as amended. 16 U.S.C.A. § 704 and note. It is "to carry out the purposes of the convention," which are: "Saving from indiscriminate slaughter" and "of insuring the preservation of such migratory birds as are either useful to man or harmless." Certainly it is "rationally conceivable" by the Congress that prohibiting baited hunting will aid in preventing the extinction of the waterfowl, as the carrier pigeon was extinguished.

The subjects which section 3 requires to be stated by the Secretary in making his determination, show the impracticability of a specific legislative provision to meet the exigencies arising from these wild fowls' "varying breeding habits," the "zones of temperature" of their successive habitats, their "distribution, abundance, economic value," and "times and lines of migratory flight." A drought in Manitoba, narrowing in the spring and summer the watered nesting areas and concentrating the eggs and fledglings, to the seagull, foxes, and other preying birds and animals, may require a regulative restricting of hunting for the following fall and winter while the Congress may not be in session. Such exigencies may be multiplied indefinitely.

The situation is analogous to that in United States v. Grimaud, 220 U.S. 506, 517, 31 S.Ct. 480, 55 L.Ed. 563, recognized as not overruled in the Panama Refining Case, supra, 293 U.S. 388, at page 428, 55 S.Ct. 241, 251, 79 L.Ed. 446. There grazing regulations, governing the wide variance of conditions in the national forests, are upheld under a practical consideration of the nation's obligation to the trees and pasture preserves of the reserved forest areas and the impossibility of detailed control by statute. The preservation of these waterfowl is identical in principle.

E. *The regulation does not lack the definiteness necessary to describe a penal offense.*

■ Nor is there weight in appellants' contention that there is such vagueness in terms " * * * Not permitted to be taken by means, aid, or use, directly or indirectly, of corn, wheat, oats, or other grain or products thereof, salt, or any kind of feed whatsoever, placed, deposited, distributed, scattered, or otherwise put out whereby such waterfowl or doves are lured, attracted, or enticed, * * * " that the offenders are not properly advised of the offense. Common sense discloses exactly what these words mean; it being held that "indirectly" clearly applies to any luring by grain of the birds to the hunting areas, regardless of whether the grain is spread before particular blinds or more widely scattered.

Since the Migratory Bird Treaty Act, conferring on the Secretary and the President power to make the regulation prohibiting baited hunting, is authorized by both the Congress and the Convention, the District Court rightly decided that appellants were not entitled to an injunction to protect the damage to their properties by restraining appellees from prosecution for their past and threatened violations of the regulations.

Affirmed.

STEPHENS, Circuit Judge (concurring).

I concur in the conclusions reached by both of my associates that the judgment of dismissal should be affirmed.

I do not agree with Judge HEALY that the United States District Court was, or is, without jurisdiction to entertain the cause.

I agree with the conclusions reached by Judge DENMAN that the regulation, the subject of complaint, is valid under a valid congressional act. However, it must be remembered that the validity of the treaty (39 Stat. 1702) and the power of Congress to pass an act appropriate to the effectuation of the treaty purposes are not in issue. Appellants contend that the treaty, in so far as pertinent here, consists of an agreement regarding the subject of closed seasons for hunting or taking game birds, and does not contemplate any regulation as to the *means* of hunting or taking them. They argue from this premise that both the act of Congress, 16 U.S.C.A. § 703 et seq., and the regulation of the Secretary of Agriculture as to the means of hunting or taking birds have no authority in law. The main opinion goes into the details and I shall not repeat them here.

This conclusion, as it seems to me, results from a too literal interpretation of the treaty itself. The closed seasons are provided as a *means* toward the protection and preservation of migratory bird species as expressed in the preamble of the treaty.

Migratory birds of North America—the subject of the treaty—move in accordance with no man's will and in accordance with no policy of the state or nations. Their continued propagation depends upon their seasonal flights from Canada into and across the United States, into Mexico, and back again.

Their preservation is of great importance, and, therefore, a legitimate subject of governmental attention.

The settlement of practically every square mile of the states has produced so many hunters that the migratory flocks have met almost unrestrained slaughter upon their descent for food, rest, and seasonal stay. Local enforcement of local regulations has proved tragically inadequate.

In these circumstances the governments of the United States and Great Britain have taken jurisdiction of the subject matter through their treaty making powers and, though it is not generally known, a like convention has been held by the United States and Mexico. The Treaty with Mexico has not as yet become effective.

The practical aspect of the problem facing the nations' delegates in convention, was, of course, a necessity for curtailment of hunting, and they struck directly at this ancient privilege. They prohibited hunting entirely between the 10th of March and the 1st of September of every year. Then they provided that hunting should, in no case, be permitted for more than three and one-half months of each year, leaving further restrictions or prohibitions of hunting migratory birds to the nations through such regulations as they might decree. That the purposes of the treaty should not be allowed to fail, each nation contracted to pass such measures as would best serve to aid their successful accomplishment. More effective action could not well have been taken by the federal government to take over the whole subject matter under its treaty powers.

Pursuant to the terms of the treaty, Congress passed a comprehensive enabling act to effectuate the purposes of the treaty. This act forbade any unrestrained open season for hunting, but provided for a conditional season—that is, hunting should be permitted only under certain restrictions and regulations pertinent to and tending toward the realization of the treaty objectives.

I think the restriction in the form of the regulation, here made the subject of complaint, is pertinent to such objectives. It is not indefinite, discriminatory, nor does it offend against the United States Constitution as to the delegation of powers. Therefore it has the dignity of law.

In deciding this appeal it is wholly unnecessary to consider the commerce clause of the Constitution, art. 1, § 8, cl. 3, and, for that reason I do not concur in Judge DENMAN'S opinion treating of that subject. I do not intend to intimate, however, that congressional legislation upon such subject, independent of the treaty power, would be unconstitutional.

The general subject of migratory birds entices one into a choice chapter of reminiscence. The call of the brant and the sand hill crane from the lofty "V" shaped

armadas, the natural navigators of the stratosphere!

"For the people of the village
Saw the flock of brant with wonder."

The sting of the wind-driven rain upon the face of the boy, out with his gun and his dog—*hunting!*

The instinct to exercise "dominion over the fowl of the air" sends him on, seemingly never taxing his young endurance as he follows likely creeks for mallards, canvasback, teal, or even, on a luckless day, the lowly spoonbill. Applying his outdoor knowledge and his wits, he approaches behind natural blinds and revels in his dexterity and thrills with his skill as the disturbed birds leave the water.

The trudge homeward with a good bag, his faithful spaniel at his side, his gum boots "asop." The top of every boot is always below some water line of the day's tramp. At last, the coal oil lamp's yellow glow shows the family at the supper table, and now the boy proudly shows his kill, in answer to the animated, "What luck?" "My, you are late, we were getting uneasy." Of course a share of supper was kept back and warm in the oven by a thoughtful one. Those were happy days!

Now there are no great flocks in the air, and creeks and the few undrained ponds are given over to gulls and mudhens. The shotgun is oiled and encased. The nations have waited too long.

It is significant that as I end this opinion my eye notes a newspaper dispatch: "George Bird Grinnell, who gained the title of the Father of American Conservation for his work in the cause of saving wild life, died today."

The decree of dismissal in the United States District Court should be affirmed.

HEALY, Circuit Judge (concurring).

While I am not in disagreement with the conclusions of the majority, I think the only appropriate action for this court to take is to affirm the judgment of dismissal on the ground that the appellants are in no position to maintain the suit.

The bill is one to enjoin public officers from enforcing the criminal laws. I believe it should not be entertained unless the jurisdiction of the court is plain and the complainants have established a clear right to equitable consideration. In re Sawyer, 124 U.S. 200, 8 S.Ct. 482, 31 L. Ed. 402; Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283.

Appellants are private recreational clubs, organized solely for the benefit of their members and guests. Three of them are corporations, one an unincorporated association. The attention of the court has not been called to any provision of the state law, and I believe there is none, by which a corporation or an unincorporated association may obtain a license to take wild birds. Only natural persons are so licensed. Without a license, hunting or the taking of game is unlawful in California and is punishable as a criminal offense. Fish and Game Code, § 420, St. Cal.1933, p. 436.

The matter in controversy in this suit is the right to take migratory birds by means of baiting. Appellants have undertaken to champion that right. It is a right which they do not possess and which it would be unlawful for them to exercise, even in the absence of the act of Congress and the regulation prohibiting such taking. I do not believe that under these circumstances they have any standing in equity, regardless of damage which they may suffer through the enforcement of the act. Compare Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. ——.

It is without point to say that, except for the regulation, the appellants would be free to distribute grain on their lands or to put out feed which will attract wild ducks. The regulation does not prohibit that. It prohibits taking ducks with the aid of baiting; and the appellants neither do that, nor are they entitled to do it under state law.

Nor is the fact that they may become involved as accessories in the threatened criminal prosecution of their members sufficient to confer equitable jurisdiction. The depreciation in property values which it is claimed will result is not a direct damage, but is purely consequential or collateral. I am unable to see that it affords a measure of the value of the thing in controversy as contemplated by section 24(1) of the Judicial Code, as amended, 28 U.S.C.A. § 41(1), even though appellants were otherwise qualified. See Healy v. Ratta, 292 U.S. 263, at page 268, 54 S.Ct. 700, 702, 78 L.Ed. 1248. A merchant who invests in a stock of automatic shotguns would suffer a similar depreciation in the

value of his merchandise in the face of a statute prohibiting the shooting of birds with guns of that type. But I apprehend that nobody would contend that his threatened loss would entitle him to sue in equity to enjoin the enforcement of the allegedly invalid act; or that a depreciation of $3,000 or more in the value of his merchandise would furnish a measure of the value of the thing in controversy sufficient to confer federal jurisdiction.

It is a familiar principle that one who attacks the constitutionality of a statute is not the champion of any rights except his own. Henneford v. Silas Mason Co., 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814. And it is well settled that, "while an unconstitutional act is no law, attacks upon the validity of laws can only be entertained when made by those whose rights are directly affected." Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 17, 62 L.Ed. 149, L.R.A.1918C, 210, Ann.Cas.1918A, 1201.

Since, independent of the statute, it would be unlawful for the appellants to do what the statute prohibits, and since the act bears upon their property rights only in a collateral way, their suit was properly dismissed.

Whether appellants have such standing as representatives of their members as would enable them to maintain the action, I think we need not stop to inquire. There is no showing that their members will suffer any monetary damage from the enforcement of the regulation, or, if so, how much the damage would be. KVOS, Inc., v. Associated Press, 299 U.S. 269–279, 57 S.Ct. 197–201, 81 L.Ed. 183.