Filed 2/11/14 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| LAW SCHOOL ADMISSION COUNCIL, INC., | C073187 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201300135574CUMCGDS) |
| v. | |
| STATE OF CALIFORNIA et al., | ORDER MODIFYING OPINION |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed January 13, 2014, in the above cause is modified in the following respects:

Change the last line of the editorial information to read:  Fulbright & Jaworski, Robert E. Darby and Robert A. Burgoyne for Plaintiff and Respondent.

On page 30, change the third sentence in the first full paragraph to read:

We therefore consider it forfeited for purposes of this appeal.

The paragraph's remaining text is deleted following the citation:  (*Americas Propane, LP v. Landstar Ranger, Inc.* (2010) 184 Cal.App.4th 981, 1001, fn. 4; *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

This modification does not change the judgment.

1

_____ROBIE_____, Acting P.J.

_____BUTZ_____, J.

_____HOCH_____, J.

Filed 1/13/14 (unmodified version)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| LAW SCHOOL ADMISSION COUNCIL, INC., | |
| Plaintiff and Respondent, | C073187 |
| v. | (Super. Ct. No. 34201300135574CUMCGDS) |
| STATE OF CALIFORNIA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Raymond M. Cadei, Judge.  Reversed with directions.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Ismael A. Castro, Christine M. Murphy and R. Matthew Wise, Deputy Attorneys General, for Defendants and Appellants.

Legal Aid Society - Employment Law Center and Claudia Center for Association on Higher Education and Disability, California Association for Postsecondary Education and Disability, Civil Rights Education and Enforcement Center, Council of Parent Attorneys and Advocates, Disability Rights Advocates, Disability Rights California, Disability Rights Education & Defense Fund, Disability Rights Legal Center, Edge Foundation, Everyone Reading, Inc., Legal Aid Society - Employment Law Center, National Association of Law Students with Disabilities, National Federation of the Blind, and Marilyn J. Bartlett and Richard K. Neumann, Jr., as Amici Curiae on behalf of Defendants and Appellants.

Fulbright & Jaworski and Robert E. Darby for Plaintiff and Respondent.

This case involves a constitutional challenge to Education Code section 99161.5, which requires Law School Admission Council, Inc. (LSAC), the test sponsor of the Law School Admission Test (LSAT), to "provide testing accommodations to a test subject with a disability who makes a timely request to ensure that the [LSAT] accurately reflects the aptitude, achievement levels, or other factors that the test purports to measure and does not reflect the test subject's disability." (Ed. Code, § 99161.5, subd. (a)(1).)[1] The section also requires LSAC to "give considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received by the test subject in similar testing situations when determining whether to grant an accommodation to the test subject" (§ 99161.5, subd. (b)), and prohibits the organization from either "notify[ing] a test score recipient that the score of any test subject was obtained by a subject who received an accommodation" or "withhold[ing] any information that would lead a test score recipient to deduce that a score was earned by a subject who received an accommodation." (§ 99161.5, subd. (c)(1) & (2).)

The State of California (the State) appeals from the issuance of a preliminary injunction ordering the State to refrain from enforcing section 99161.5 against LSAC pending trial.[2] The trial court ruled LSAC demonstrated a likelihood of prevailing on its claim that section 99161.5 violates the equal protection clause of the California

---

[1]     Undesignated statutory references are to the Education Code.

[2]     In support of the State, the following amici curiae joined to file a brief: Association on Higher Education and Disability, California Association for Postsecondary Education and Disability, Civil Rights Education and Enforcement Center, Council of Parent Attorneys and Advocates, Disability Rights Advocates, Disability Rights California, Disability Rights Education & Defense Fund, Disability Rights Legal Center, Edge Foundation, Everyone Reading, Inc., Legal Aid Society - Employment Law Center, National Association of Law Students with Disabilities, National Federation of the Blind, and Marilyn J. Bartlett and Richard K. Neumann, Jr.

Constitution (Cal. Const., art. I, § 7, subd. (a))[3] because it "lacks a rational basis for directing its prohibitions to LSAC exclusively, and not to other testing entities." The trial court also found "the risk of infringement of [LSAC's] constitutional rights is sufficient harm to warrant injunctive relief." We issued a limited stay of the trial court's preliminary injunction order pending resolution of this appeal, specifically directing LSAC to comply with section 99161.5, subdivision (c). We now reverse the preliminary injunction order. As we explain, section 99161.5 does not violate LSAC's right to equal protection under the law because LSAC is not similarly situated to other testing entities for purposes of the law. Nor has LSAC demonstrated a likelihood of prevailing on its additional claims, i.e., that section 99161.5 violates its right to liberty of speech, constitutes invalid special legislation, or amounts to a prohibited bill of attainder. The only claim that cannot be determined against LSAC as a matter of law is the liberty of speech claim. But even as to that claim, the balance of interim harm does not tip in LSAC's favor. Accordingly, it was an abuse of the trial court's discretion to issue the preliminary injunction.

BACKGROUND

LSAC is a non-profit corporation, the primary purpose of which is to assist its members—over 200 law schools in the United States, Canada, and Australia—in their admissions process. In accordance with this purpose, LSAC prepares and administers the LSAT, a standardized test that is administered four times a year in California and other jurisdictions both inside and outside the United States.

According to James M. Vaseleck, Jr., Senior Director of Public Affairs and Deputy General Counsel of LSAC, the LSAT "provides a standard measure of acquired reading and verbal reasoning skills, and measures skills that are considered essential for success in law school, including: the reading and comprehension of complex texts with

---

[3]     Undesignated constitutional references are to the California Constitution.

3

accuracy and insight; the organization and management of information and the ability to draw reasonable inferences from that information; and the analysis and evaluation of the reasoning and arguments of others." The declaration submitted by Vaseleck in support of the preliminary injunction continues: "As shown in numerous validity studies performed by LSAC, the LSAT is a strong predictor of first-year law school grades, and a combination of students' LSAT scores and undergraduate grade point averages (GPAs) gives a better prediction of law school performance than either LSAT scores or GPAs alone."[4] Generally, after a prospective law student takes the LSAT, LSAC provides to its member law schools a "score report," including "a percentile ranking and the score band

---

[4]     In Shultz and Zedeck, *Predicting Lawyer Effectiveness:  Broadening the Basis for Law School Admission Decisions* (2011) 36 Law & Soc. Inquiry 620, the authors acknowledge LSAT scores and undergraduate GPAs "have proven to be valuable predictors of first-year law school grades," but point out "they do not account for success in the legal profession or for law school outcomes other than first-year grades." (*Id*. at p. 621.)  The authors note this to be "unsurprising" since first-year courses are "often graded using a similar methodology [to the LSAT]," i.e., by "exams that require students to read fact patterns, identify and analyze legal issues, assemble evidence and arguments, and sometimes to assess implications." (*Id*. at p. 622.)  Additionally, "test-taking speed can predict performance on both the LSAT and eventual law school exams--a finding that increases the predictive validity of the LSAT.  However, test-taking speed diminished the predictive value of the LSAT significantly when first-year grades were based on take-home exams or papers instead of exams." (*Ibid*.)  Thus, "the LSAT may be measuring cognitive test-taking skills that are rewarded in first-year courses," but less predictive of success in subsequent years and professional practice. (*Id*. at p. 623.)  The authors also point out that "[r]esearch consistently shows that affluent White students perform better on standardized tests, including the LSAT, than their less advantaged or minority peers [citations].  As a result, a heavy emphasis on LSAT scores in admission decisions substantially reduces the presence of African American and Latino students in law school and the profession as well as diminishing prospects from most non-elite families [citation]." (*Id*. at p. 621.)  The authors advocate for the employment of new tests designed to assess factors important to effectiveness as a lawyer—including, among others, creativity, practical judgment, writing, speaking, listening, strategic planning, negotiation skills, passion, diligence, and honesty—to be used in conjunction with LSAT scores and undergraduate GPAs in order to "strengthen the connections between legal education and the profession" and "significantly increase diversity over what will likely be achieved when academic indicators dominate the process." (*Id*. at pp. 630, 656-657.)

within which each examinee's score fell for that test administration, relative to other examinees," the "average LSAT score" for that test administration, and "predictive index values (a statistical combination of undergraduate GPA and LSAT scores)."

*The Americans with Disabilities Act (ADA)*

The ADA (42 U.S.C. § 12101 et seq.) requires entities that offer examinations related to applications for postsecondary education, such as LSAC, to "offer such examinations . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." (42 U.S.C. § 12189.) Department of Justice regulations interpret this section to require the testing entity to ensure that "[t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)." (28 C.F.R. § 36.309(b)(1)(i).) The testing entity must also ensure, among other things, that "[a]ny request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested," and that "the entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations." (28 C.F.R. § 36.309(b)(1)(iv), (v).) The regulations also provide: "Required modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation of the manner in which the examination is given." (28 C.F.R. § 36.309(b)(2).)

*LSAC's Accommodations Procedures*

Acknowledging LSAC is required to comply with federal law, Vaseleck states in his declaration: "LSAC makes reasonable testing accommodations available on the

LSAT for individuals with documented disabilities who are unable to take the test under standard testing conditions, in accordance with the [ADA]. Accommodations have been requested based on a variety of impairments, including: hearing impairments; learning disorders; attention deficit disorders; neurological impairments; physical disabilities; psychological disabilities; visual impairments; and medical disabilities. In reviewing requests for testing accommodations, LSAC gives considerable weight to an applicant's receipt of testing accommodations in prior, similar testing situations. [¶] . . . The types of accommodation(s) provided vary depending on the nature of a test taker's disability. Possible testing accommodations include changes to the format of the test (such as large print or Braille tests), or changes to the standard test administration (such as use of a reader, a wheelchair-accessible testing center, an amanuensis, additional rest time between sections of the test, and additional testing time). Additional testing time is the most commonly requested LSAT accommodation."

LSAT applicants seeking an accommodation for a disability must submit a request to LSAC with supporting documentation. This request, which cannot be reviewed until the applicant is registered for the LSAT, must include the following: "(1) an LSAT Candidate Form, (2) an LSAT Evaluator Form completed by a qualified/licensed professional who is familiar with the impact of [the applicant's] disorder/condition on a major life activity that affects [the applicant's] ability to perform on the LSAT or other similar, timed, standardized admission tests, and (3) the relevant Cognitive, Psychological, Vision, or Physical Evaluation Report(s) and results of past standardized tests such as the SAT/ACT [Scholastic Assessment Test/formerly American College Test]." Vaseleck's declaration states LSAC "makes accommodation decisions within a reasonable amount of time after receiving completed applications and the requisite supporting documentation. Decisions are generally made within 14 days of LSAC's receipt of a complete application request, often sooner. When LSAC denies a request, it informs the applicant why the request was denied." Upon denial of an accommodation

6

request, the applicant may submit a request for reconsideration, which is reviewed after all initial accommodation requests have been processed.

When an accommodation request seeking additional testing time is granted, the score report LSAC sends to law schools does not include the percentile ranking, score band, average LSAT score, or predictive index because, as Vaseleck explains, "scores achieved with extra testing time . . . . [¶] . . . [¶] . . . have been shown by LSAC's research not to be comparable to scores achieved with standard testing time." According to LSAC's research, "scores achieved with extra testing time tend to over-predict how the examinee will perform in the first year of law school." In addition to omitting the foregoing information from the score report, LSAC provides a letter to law schools receiving such a score report explaining the applicant took the LSAT "under nonstandard time conditions," that "LSAC research indicates that scores earned under nonstandard time conditions do not have the same meaning as scores earned under standard time conditions," and the "applicant's score should be interpreted with great sensitivity and flexibility."

### Enactment of Section 99161.5

In September 2012, the Governor signed into law Assembly Bill No. 2122, which added section 99161.5 to the Education Code. (Stats. 2012, ch. 583, § 1.) This section, effective January 1, 2013, provides:

"(a)(1) The test sponsor of the [LSAT] shall provide testing accommodations to a test subject with a disability who makes a timely request to ensure that the [LSAT] accurately reflects the aptitude, achievement levels, or other factors that the test purports to measure and does not reflect the test subject's disability. This paragraph does not constitute a change in, but is declaratory of, existing law.

"(2) The process for determining whether to grant an accommodation under paragraph (1) shall be made public, and the decision whether or not to approve a request for an accommodation shall be conveyed to the requester within a reasonable amount of

time.  If the test sponsor of the [LSAT] does not approve a request for accommodation, the test sponsor shall state the reasons for the denial of the request to the requester in writing.

"(3) The test sponsor of the [LSAT] shall establish a timely appeals process for a test subject who is denied an accommodation request.  The test sponsor of the [LSAT] shall clearly post on the [LSAT] Internet Web site information regarding refund policies for individuals whose requests for accommodation are denied.

"(b) Whenever a test subject has received formal testing accommodations from a postsecondary educational institution for a disability as defined in subdivision (j), (*l*), or (m) of Section 12926 of the Government Code, the test sponsor of the [LSAT] shall, consistent with existing law, give considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received by the test subject in similar testing situations when determining whether to grant an accommodation to the test subject.

"(c)(1) The test sponsor of the [LSAT] shall not notify a test score recipient that the score of any test subject was obtained by a subject who received an accommodation pursuant to this section.

"(2) The test sponsor of the [LSAT] shall not withhold any information that would lead a test score recipient to deduce that a score was earned by a subject who received an accommodation pursuant to this section.

"(3) This subdivision does not constitute a change in, but is declaratory of, existing law.

"(d) This section shall not be construed to limit or replace any other right or remedy that exists under state or federal law.

"(e) This section shall not provide greater protections to persons with disabilities than those provided by Section 51 of the Civil Code."  (§ 99161.5.)

8

The legislative history of Assembly Bill No. 2122 reveals section 99161.5 was directed exclusively toward the LSAT's test sponsor, rather than made to apply generally to the numerous test sponsors conducting testing services in California, because the Legislature viewed LSAC's testing accommodations procedures as more onerous than those of other test sponsors. The Assembly Committee on Higher Education's bill analysis notes that, according to the bill's author, former Assembly Member (now State Senator) Ricardo Lara, the bill "targets LSAC" rather than other test sponsors because "the process for test subjects to request and obtain accommodations when taking the LSAT creates significant barriers for persons with disabilities." (Assem. Com. on Higher Education, Analysis of Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Mar. 21, 2012, pp. 1-3.) The Senate Rules Committee, Office of Senate Floor Analyses, third reading analysis notes: "According to the author, '[u]nlike the [LSAT], students requesting accommodations for high stakes exams such as the Graduate Records Examinations [(GRE)], which is sponsored by the Educational Testing Service, can easily submit a completed Certification of Eligibility in lieu of disability documentation. Clearly, the [LSAC's] stringent documentation policies create a gap between individuals who can afford the expensive assessment and those who cannot. Additionally, under LSAC's policies, when a student obtains extra time based on a cognitive or physical disability, his or her score is identified and a letter is sent to law schools notifying that an accommodation was granted and advising that the score should be interpreted with great sensitivity. This practice is referred to as "flagging" and it creates a chilling effect that discourages individuals from requesting testing accommodations.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Aug. 29, 2012, p. 6.)

We provide a more detailed account of the legislative history in the discussion portion of this opinion.

9

On January 10, 2013, LSAC filed a complaint for declaratory and injunctive relief challenging the constitutionality of section 99161.5 under the California Constitution. The complaint alleged the newly-enacted statute: (1) violated LSAC's right to "equal protection of the laws" (art. I, § 7, subd. (a)); (2) abridged its "liberty of speech" (art. I, § 2, subd. (a)); (3) constituted an invalid "special statute" (art. IV, § 16, subd. (b)); and also (4) amounted to a prohibited "bill of attainder" (art. I, § 9). The same day, LSAC applied for a temporary restraining order and for an order to show cause regarding issuance of a preliminary injunction. On January 15, 2013, the trial court denied the request for a temporary restraining order, granted the request for an order to show cause, and set the matter for a hearing on the preliminary injunction to be held on February 1, 2013.

On January 17, 2013, LSAC filed a motion for a preliminary injunction, arguing in support of the motion that LSAC was likely to succeed on the merits of its claims and it would suffer irreparable harm if "forced to send out score reports with incomplete and inaccurate information for scores obtained with extra time." The bulk of the merits argument was directed toward the equal protection claim. LSAC argued it is similarly situated to other testing entities, such as Educational Testing Service (ETS), College Board, the Association of American Medical Colleges (AAMC), the American Osteopathic Board of Emergency Medicine (Osteopathic Board), and the North American Board of Naturopathic Examiners (Naturopathic Board), and the Legislature had no rational basis for treating it differently by enacting a statute directed exclusively at LSAC. LSAC submitted evidence regarding the accommodations policies of these testing entities. For example, AAMC, which administers the Medical College Admission Test (MCAT), notes on its website: "For tests that are administered under non-standard conditions, primarily those that involve a change in the timing of the test, we do not know if the scores obtained will be comparable to scores obtained under standard testing conditions. Therefore, tests that are administered under non-standard conditions will be

10

noted as non-standard on score reports. Score reports do not indicate the reason for the administration of a non-standard MCAT exam or the specific type of accommodation that was provided." Similarly, Naturopathic Board, which administers the Naturopathic Physicians Licensing Examination (NPLEX), includes in the "report/transcript" sent to regulatory authorities a notation that the examination was administered "under non-standard testing conditions."

In opposition, the State argued, "LSAC is not similarly situated to other testing entities in California, such as ETS or College Board, . . . because it 'creates significant barriers for people with disabilities while other test sponsors no longer flag scores and have less burdensome requirements for requesting accommodations.' " The State also argued the Legislature had "a rational basis for focusing its attention on LSAC's accommodation practices" due to the fact "LSAC has distinguished itself among testing entities for its burdensome requirements for requesting accommodations and its policy of flagging scores under accommodated extended time conditions." The State pointed to LSAC's own evidence in support of the preliminary injunction, specifically the accommodations policies of ETS and College Board, which administer the GRE and SAT, respectively. For example, as noted in the legislative history of section 99161.5, ETS grants basic accommodations, including "time and one-half and/or additional rest breaks," to applicants with long-standing learning disabilities without requiring the costly diagnostic reevaluation required by LSAC. Instead, such an applicant need only submit a certification of eligibility, which does not require extensive documentation. Similarly, College Board has a "school verification process" that allows the applicant's school to verify he or she meets College Board's criteria for requesting an accommodation; "in most cases, the student does not need to submit additional documentation of a disability." Neither ETS nor College Board has a policy of flagging non-standard test scores.

On February 1, 2013, the trial court heard argument on the motion and issued the requested preliminary injunction. The trial court ruled LSAC demonstrated a likelihood

11

of prevailing on its claim that section 99161.5 violated its right to equal protection because the statute "lacks a rational basis for directing its prohibitions to LSAC exclusively, and not to other testing entities." The trial court explained: "The Legislature's legitimate interest in prohibiting discrimination is not in dispute. However, legislation that seeks to further this interest must not single out one particular entity for regulation without a rational basis for doing so. The reasons presented for limiting application of section 99161.5 to LSAC only, specifically, that LSAC engages in flagging while other testing entities do not, are simply not plausibly related to the stated goals of the statute. First, as noted above, other testing entities may change their practices to engage in flagging, and would be permitted to do so under section 99161.5, while LSAC would not. Second, LSAC presents evidence that other testing entities do report scores earned with extra time differently than standard scores. . . . Given that other testing entities would be permitted to engage in flagging under the statute, and that some other testing entities actually do engage in flagging, the anti-discrimination purposes of the statute are not rationally served by exclusively targeting LSAC for regulation." The trial court also concluded that "the risk of infringement of [LSAC's] constitutional rights is sufficient harm to warrant injunctive relief."

We issued a limited stay of the preliminary injunction order pending resolution of this appeal, specifically directing LSAC to comply with section 99161.5, subdivision (c). We now reverse.

DISCUSSION

I

*The Grant and Review of Preliminary Injunctive Relief*

"The general purpose of a preliminary injunction is to preserve the status quo pending a determination on the merits of the action. [Citation.] ' "The granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy. It merely determines that the court, balancing the respective equities of the

12

parties, concludes that, pending a trial on the merits, the defendant should or . . . should not be restrained from exercising the right claimed by him [or her].” ’ [Citation.]” (*SB Liberty, LLC v. Isla Verde Assn., Inc.* (2013) 217 Cal.App.4th 272, 280.)

“In deciding whether to issue a preliminary injunction, a trial court must evaluate two interrelated factors:  (i) the likelihood that the party seeking the injunction will ultimately prevail on the merits of his [or her] claim, and (ii) the balance of harm presented, i.e., the comparative consequences of the issuance and nonissuance of the injunction.  [Citations.]” (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 441-442.)  “The trial court’s determination must be guided by a ‘mix’ of the potential-merit and interim-harm factors; the greater the plaintiff’s showing on one, the less must be shown on the other to support an injunction.  [Citation.]” (*Butt v. State of California* (1992) 4 Cal.4th 668, 678.)  However, “[a] trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim.” (*Ibid*.)

Ordinarily, appellate review is limited to whether the trial court abused its discretion in evaluating the foregoing factors. (*Citizens to Save California v. California Fair Political Practices Com.* (2006) 145 Cal.App.4th 736.)  “Occasionally, however, the likelihood of prevailing on the merits depends upon a question of pure law rather than upon the evidence to be introduced at a subsequent full trial.  This issue can arise, for example, when it is contended that an ordinance or statute is unconstitutional on its face and that no factual controversy remains to be tried.  If such a question of pure law is presented, it can sometimes be determinative over the other factor, for example, when the defendant shows that the plaintiff’s interpretation is wrong as a matter of law and thus the plaintiff has no possibility of success on the merits.  [Citations.]” (*Hunter v. City of Whittier* (1989) 209 Cal.App.3d 588, 595-596; see, e.g., *King v. Meese* (1987) 43 Cal.3d 1217, 1235.)  Of course, such questions of law are subject to de novo review. (*Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137, 1145-1146.)

## II

### *Likelihood of Prevailing on the Merits*

As mentioned, the trial court ruled LSAC demonstrated a likelihood of prevailing on its claim that section 99161.5 violates the equal protection clause of the California Constitution because it "lacks a rational basis for directing its prohibitions to LSAC exclusively, and not to other testing entities." We disagree. As a matter of law, section 99161.5 does not violate LSAC's right to equal protection because LSAC is not similarly situated to other testing entities for purposes of the law. However, because "we review the correctness of the trial court's ruling, not its reasoning," a principle that is "particularly applicable to rulings granting or denying preliminary injunctions" (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1049), we must also determine whether it would have been an abuse of discretion for the trial court to have ruled LSAC demonstrated a likelihood of prevailing on its additional claims, i.e., section 99161.5 violates LSAC's right to freedom of speech, constitutes special legislation, or amounts to a bill of attainder. We address each ground of purported unconstitutionality below.

### A.

### *Equal Protection*

The California Constitution prohibits the denial of "equal protection of the laws." (Art. I, § 7, subd. (a).) "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally." (*People v. Brown* (2012) 54 Cal.4th 314, 328; *In re J.* (1979) 25 Cal.3d 522, 530.) As a corporation, LSAC "is considered a 'person' entitled to the constitutional guarantee of equal protection." (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 434 (*Walgreen*).)

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether

14

persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged. [Citation.]' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) " 'If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.]' " (*Walgreen*, *supra*, 185 Cal.App.4th at p. 434, quoting *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

Thus, in order to determine whether LSAC and other test sponsors, such as ETS and College Board, are similarly situated, we must first determine the purposes of section 99161.5. For this, we turn to the legislative history.

The Senate Rules Committee, Office of Senate Floor Analyses, third reading analysis of Assembly Bill No. 2122 notes: "[T]he requirements for verifying disabilities and granting accommodations varies significantly among test sponsors, including: [¶] 1. [ETS], which administers the [GRE], requires test subjects to submit requests for accommodations, including current documentation from a qualified professional supporting each testing accommodation requested, by the specified registration deadline. Recognizing the costs associated with obtaining current documentation, ETS grants basic accommodations to applicants with long-standing learning disabilities, such as time-and-a-half and rest breaks, without requiring diagnostic reevaluation. [¶] 2. College Board, which administers the [SAT], requires accommodation requests to be approved by College Board's Services for Students with Disabilities. Documentation must be provided showing that the student has a disability, that the disability causes a functional limitation that affects participation in tests, and that the requested accommodations are appropriate. Students generally work through their high school disability services office to receive accommodations from College Board. [¶] 3. LSAC, which administers the LSAT, requires applicants seeking accommodations to first register to take the examination and then to complete and submit for review an extensive Accommodations Request Packet. The Accommodations Request Packet requires, among other items, copies of accommodations provided for prior related testing and coursework and an

15

Evaluator Form completed by a qualified professional verifying the disability and need for accommodations.  LSAC indicates initial responses to requests for accommodations occur within 14 days of receipt.  However, depending on the nature of the request and documentation submitted, LSAC indicates the process for approval may take 'substantially longer.' "  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Aug. 9, 2012, pp. 4-5.)

This bill analysis notes the version of the bill passed in the Assembly would have "require[d] the LSAT test sponsor to provide accommodations to people who received formal testing accommodations from a postsecondary educational institution," explaining:  "According to the author's office, an individual may have a well-documented history of accommodations, yet LSAC will only consider prior postsecondary testing accommodations, among other factors.  The LSAC argues that no single factor should be used in determining the need for an accommodation and that other objective and credible evidence, in addition to prior academic use of accommodations, should be evaluated.  [¶]  While this bill does not specify what type of documentation a person who received accommodations from a postsecondary educational institution must provide to the LSAC, registration procedures for [other standardized tests] indicate that a person requesting accommodations that were provided by a postsecondary educational institution may submit a Certification of Eligibility that appears to be less extensive than the documentation required by LSAC."[5]  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Aug. 29, 2012, p. 5.)  However, the Senate amended the bill to require only that LSAC,

---

[5]    As amended in the Assembly on March 21, 2012, section 99161.5, subdivision (b), would have provided:  "Whenever a test subject has received formal testing accommodations from a postsecondary educational institution, the test sponsor of the [LSAT] *shall provide accommodations to that test subject*."  (Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Mar. 21, 2012.)

16

"consistent with existing law, *give considerable weight* to documentation of past modifications, accommodations, or auxiliary aids or services received by the test subject in similar testing situations when determining whether to grant an accommodation to the test subject." (Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Aug. 24, 2012, italics added.) This amendment mirrors language used in federal regulations interpreting the ADA. (See 28 C.F.R. § 36.309(b)(1)(v).)

The bill analysis also notes: "This bill prohibits the LSAC from notifying test score recipients (law schools) if a person received testing accommodations, a practice commonly referred to as 'flagging' a score. The author's office contends that there is no way to determine the comparability of the scores earned under non-standard conditions (when extra time is given) and standard conditions. However, the LSAC indicates that test scores are only flagged if extra time is provided as an accommodation and that evidence demonstrates that standard and nonstandard-time scores are not comparable. Further, LSAC maintains that it has an obligation to provide accurate score-interpretation information to law schools. [¶] ETS and College Board apparently no longer flag scores of people who took exams with accommodation due to litigation." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Aug. 29, 2012, p. 5.)

In support of the bill, its author, former Assembly Member Lara explained: " 'Unlike the [LSAT], students requesting accommodations for high stakes exams such as the [GRE], which is sponsored by [ETS], can easily submit a completed Certification of Eligibility in lieu of disability documentation. Clearly, [LSAC's] stringent documentation policies create a gap between individuals who can afford the expensive assessment and those who cannot. Additionally, under LSAC's policies, when a student obtains extra time based on a cognitive or physical disability, his or her score is identified and a letter is sent to law schools notifying that an accommodation was granted and advising that the score should be interpreted with great sensitivity. This practice is

17

referred to as "flagging" and it creates a chilling effect that discourages individuals from requesting testing accommodations.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Aug. 29, 2012, p. 6.) Former Assembly Member Lara also explained the bill "targets LSAC" rather than other test sponsors because "the process for test subjects to request and obtain accommodations when taking the LSAT creates significant barriers for persons with disabilities." (Assem. Com. on Higher Education, Analysis of Assem. Bill No. 2122 (2011-2012 Reg. Sess.) as amended Mar. 21, 2012, pp. 1-3.)

Thus, the Legislature appears to have been concerned that LSAC's policies regarding accommodations, unlike those of other test sponsors, placed undue burdens on applicants with disabilities. Stated broadly, the purpose is to prevent discrimination. However, the Legislature also appears to have had a more narrow purpose, the prevention of discrimination *in the law school admissions process*. Throughout the legislative history, the support of the American Bar Association (ABA) is noted. A "Fact Sheet" prepared by former Assembly Member Lara explains: "In response to the small number of individuals with disabilities represented in the legal profession, the [ABA] Commission on Disability Rights recently passed a unanimous resolution urging entities who administer the LSAT to improve the way it handles accommodation requests from test-takers with disabilities. . . . [¶] A major contributing factor to the lack of representation of individuals with disabilities in the legal profession can be attributed to the barriers individuals face when taking the [LSAT]." The fact sheet then describes LSAC's objectionable policies, i.e., the "comprehensive assessment report" that "can cost an individual over $3,000" and the practice of " 'flagging' " nonstandard test scores, and urges passage of Assembly Bill No. 2122 as a "Solution" to the problem. The ABA resolution[6] and a report submitted by the chairperson of the ABA's Commission on

---

**6** The ABA resolution provided: "RESOLVED, That the [ABA] urges all entities that administer a law school admission test to provide appropriate accommodations for a

18

Disability Rights concluded: "Making law schools accessible to individuals with disabilities can help ensure that the legal profession is more open to persons with disabilities than it is now. The [ABA] should encourage entities that administer law school admission testing and the law schools that rely on such testing to implement the ADA and to look for creative ways to make legal education and the legal profession more accessible to students with disabilities."

For purposes of preventing discrimination *in the law school admissions process*, LSAC is not similarly situated to ETS, College Board, AAMC, or any other standardized testing entity. The reason is simple. No other standardized testing entity sponsors a law school admissions test. We find this case to be analogous to the situation in which the Legislature chooses to "resolve identical problems with respect to different professions" in a different manner. (*Kenneally v. Medical Bd.* (1994) 27 Cal.App.4th 489, 499; see also *Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 776.) For example, in *Naismith Dental Corp. v. Bd. of Dental Examiners* (1977) 68 Cal.App.3d 253, Naismith challenged the constitutionality of a provision in the Business and Professions Code prohibiting a dentist from having an additional place of practice unless " 'he [or she] is in personal attendance at each place of practice at least 50 percent of the time' " on the ground that no similar statute applied to the practice of medicine. (*Id*. at pp. 258, 262.) The Court of Appeal rejected the challenge, explaining: "The contention is squarely

test taker with a disability to best ensure that the exam results reflect what the exam is designed to measure, and not the test taker's disability. [¶] FURTHER RESOLVED, That the [ABA] urges all entities that administer, score, or report the results of a law school admission test to establish procedures to ensure that the application process, the scoring of the test, and the reporting of test scores is consistent for all applicants and does not differentiate on the basis that an applicant received an accommodation for a disability. [¶] FURTHER RESOLVED, That the [ABA] urges all entities that administer a law school admission test to: [¶] 1. Make readily accessible to applicants the policies, guidelines, and administrative procedure used for granting accommodations requested by those with disabilities; [¶] 2. Give notice to applicants, within a reasonable period of time, whether or not requested accommodations have been granted; and [¶] 3. Provide a fair process for timely reconsideration of the denial of requested accommodations."

rejected by [*Semler v. Oregon State Bd. of Dental Examiners* (1935) 294 U.S. 608, 610 [79 L.Ed. 1086, 1089]], where the court found that Semler, also a dentist, had no 'ground for objection because the particular regulation is limited to dentists and is not extended to other professional classes. The State was not bound to deal alike with all these classes, or to strike at all evils at the same time or in the same way. It could deal with the different professions according to the needs of the public in relation to each.' It has also been said by the high court that '[a] statute is not invalid under the Constitution because it might have gone farther than it did' [citation]; and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind' [citation]. California's courts are in agreement: . . . ' "The Legislature is not bound, in order to adopt a constitutionally valid statute, to extend it to all cases which might possibly be reached, but is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be the most evident." ' " (*Naismith Dental Corp. v. Bd. of Dental Examiners*, *supra*, 68 Cal.App.3d at p. 262, quoting *In re Ricky H.* (1970) 2 Cal.3d 513, 520-521.)

Here, based in part on the concern that "the lack of representation of individuals with disabilities in the legal profession can be attributed to the barriers individuals face when taking the [LSAT]," the Legislature decided to regulate the LSAT's accommodations procedures differently than those of other admissions tests. Just as the Legislature "may regulate different professions differently" (*Kenneally v. Medical Bd.*, *supra*, 27 Cal.App.4th at p. 499), we conclude the Legislature may regulate differently the various admissions tests that operate as gatekeepers to the study of the professional disciplines.

Nevertheless, LSAC asserts this case is more akin to *Walgreen*, *supra*, 185 Cal.App.4th 424, with respect to the similarly situated requirement than it is to the professional regulation cases cited above. We disagree. There, Walgreens challenged a San Francisco (City) ordinance that "prohibited a Walgreens that contains a licensed

20

pharmacy from selling tobacco products but imposed no such limitation on a Safeway supermarket or a Costco big box store that contains a licensed pharmacy." (*Id*. at p. 429.) The Court of Appeal accepted the City's concession that, "for purposes of the challenged ordinance, all retail establishments containing licensed pharmacies are similarly situated," and moved on to determine whether the City had a rational basis for treating Walgreens differently than Safeway or Costco with respect to tobacco sales. (*Id*. at pp. 434-435.) Thus, the concession made it unnecessary for the court to address the similarly situated requirement. However, the ordinance was "premised on the notion that a retail store conveys tacit approval of tobacco use when it sells prescription drugs as well as tobacco products." (*Id*. at p. 428.) For purposes of preventing the conveyance of such approval, we agree all retail establishments containing licensed pharmacies are similarly situated. Here, as we have explained, the purpose of section 99161.5 is to prevent disability discrimination in the law school admissions process. No other testing entity has anything to do with the law school admissions process. If, at some later point in time, there are multiple test sponsors for the LSAT, these sponsors would be similarly situated for purposes of section 99161.5. But because the statute applies to the "test sponsor of the [LSAT]," rather than LSAC specifically, by its very terms, the statute would apply to each such sponsor.

As a matter of law, LSAC's equal protection claim fails at the threshold because it and other testing entities (such as ETS, College Board, and AAMC) are not similarly situated for purposes of preventing disability discrimination in the law school admissions process.

**B.**

***Liberty of Speech***

Article I, section 2 of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

21

(Art. I, § 2, subd. (a).)  This provision "enjoys existence and force independent of the First Amendment to the federal Constitution" and "is at least as broad, and in some ways broader," than its federal counterpart.  (*ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc.* (2006) 138 Cal.App.4th 1307, 1314; *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 958-959 (*Kasky*).)  As a corporation, LSAC is entitled to constitutional free speech protection because "[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual."  (*First National Bank v. Bellotti* (1978) 435 U.S. 765, 777 [55 L.Ed.2d 707].)

### 1.    *Type of Speech*

We must first determine the type of speech at issue in this case.  Section 99161.5 prohibits LSAC from either "notify[ing] a test score recipient that the score of any test subject was obtained by a subject who received an accommodation" or "withhold[ing] any information that would lead a test score recipient to deduce that a score was earned by a subject who received an accommodation."  (§ 99161.5, subd. (c)(1) & (2).)  LSAC argues these provisions amount to "content-based restrictions on speech, which are particularly disfavored," and are therefore subject to "strict scrutiny review."  The State argues the statute is "subject to intermediate scrutiny, rather than strict scrutiny," because it involves a "content-neutral" restriction on speech, relates to " 'matters of purely private concern,' " and regulates "commercial speech."  We conclude section 99161.5 is subject to the same level of scrutiny applicable to the regulation of commercial speech.

We note at the outset there is no "separate test for determining what constitutes commercial speech under the state Constitution," but instead, our Supreme Court has "used the tests fashioned by the United States Supreme Court."  (*Kasky*, *supra*, 27 Cal.4th at p. 969.)  We do the same.

The United States Supreme Court has "long recognized that not all speech is of equal First Amendment importance.  It is speech on ' "matters of public concern" ' that is

22

'at the heart of the First Amendment's protection.' . . . [¶] 'The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." [Citations.] "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." [Citation.] Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the " 'highest rung of the hierarchy of First Amendment values,' " and is entitled to special protection. [Citations.]' " ' " (*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985) 472 U.S. 749, 758-759 [86 L.Ed.2d 593] (*Greenmoss*) (plur. opn. of Powell, J.), fn. omitted.) At the lowest rung of the hierarchy are forms of expression that are accorded no First Amendment protection, such as obscenity (*Miller v. California* (1973) 413 U.S. 15 [37 L.Ed.2d 419]) and speech calculated to provoke a fight (*Chaplinsky v. New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031]). In the middle, among other forms of expression, lies "commercial speech, that is, expression related solely to the economic interests of the speaker and its audience." (*Central Hudson Gas & Electric Corp. v. Public Service Com. of New York* (1980) 447 U.S. 557, 561 [65 L.Ed.2d 341] (*Central Hudson*).) The First Amendment "protects commercial speech from unwarranted governmental regulation" because "[c]ommercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." (*Id*. at p. 562.) However, the federal Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." (*Id*. at p. 563.)

Where speech is entitled to the full protection of the First Amendment, a content-based regulation "must be narrowly tailored to promote a compelling Government interest. [Citation.] If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. [Citations.] To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." (*United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803,

23

813 [146 L.Ed.2d 865].) "By contrast, regulation of commercial speech based on content is less problematic." (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 65 [77 L.Ed.2d 469].) Because the protection given to commercial speech is based on the "informational function" of this speech, "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. . . . [¶] If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." (*Central Hudson*, *supra*, 447 U.S. at pp. 563-564, fn. omitted.)

The speech regulated by section 99161.5 does not fall within the "core segment" of commercial speech. (*Kasky*, *supra*, 27 Cal.4th at p. 956.) "The United States Supreme Court has stated that the category of commercial speech consists at its core of ' "speech proposing a commercial transaction." ' [Citations.]" (*Ibid.*) Section 99161.5 prohibits LSAC from informing law schools that a particular applicant's LSAT score was earned with additional testing time and further prohibits LSAC from omitting from the score report the percentile ranking, score band, average LSAT score, or predictive index, as the withholding of this information would lead the law school to deduce the score was earned with additional testing time. (§ 99161.5, subd. (c)(1) & (2).) Obviously, the "flagging" of an LSAT score does not propose a commercial transaction. However, the United States Supreme Court "has indicated that the category of commercial speech is not

24

limited to this core segment. For example, the court has accepted as commercial speech a statement of alcohol content on the label of a beer bottle [citation], as well as statements on an attorney's letterhead and business cards identifying the attorney as a CPA (certified public accountant) and CFP (certified financial planner) [citation]." (*Kasky*, *supra*, 27 Cal.4th at p. 956.) The court has also "acknowledged that 'ambiguities may exist at the margins of the category of commercial speech.' " (*Id*. at p. 958, quoting *Edenfield v. Fane* (1993) 507 U.S. 761, 765 [123 L.Ed.2d 543]; see also *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626, 637 [85 L.Ed.2d 652] ["subject to doubt, perhaps, are the precise bounds of the category of expression that may be termed commercial speech"].)

In *Kasky*, *supra*, 27 Cal.4th 939, after reviewing the United States Supreme Court's commercial speech decisions, our Supreme Court considered three factors, "the speaker, the intended audience, and the content of the message," in determining whether the speech at issue in that case was commercial speech. (*Id*. at p. 960.) The court explained: "In typical commercial speech cases, the *speaker* is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the *intended audience* is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers." (*Ibid*.) Our Supreme Court also explained that "the factual content of the message should be commercial in character," which "typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services. This is consistent with, and implicit in, the United States Supreme Court's commercial speech decisions, each of which has involved statements about a

25

product or service, or about the operations or qualifications of the person offering the product or service." (*Id*. at p. 961, citing *Rubin v. Coors Brewing Co.* (1995) 514 U.S. 476 [131 L.Ed.2d 532] [statement of alcohol content on beer bottle label]; *Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy* (1994) 512 U.S. 136 [129 L.Ed.2d 118] [statements on an attorney's letterhead and business cards describing attorney's qualifications].)

The foregoing factors lead us to conclude the practice of flagging an LSAT score that was earned with additional testing time amounts to commercial speech. First, the speaker is LSAC. While LSAC is a non-profit corporation, it nevertheless engages in commerce. Black's Law Dictionary defines "commerce" to mean: "The exchange of goods and services, esp. on a large scale involving transportation between cities, states, and nations." (Black's Law Dict. (8th ed. 2004) p. 285, col. 1.) Citing United States Supreme Court and Ninth Circuit Court of Appeals decisions, our Supreme Court has explained that "the term 'commercial' embraces all phases of commercial activity, and need not be undertaken or motivated for profit." (*People v. Cochran* (2002) 28 Cal.4th 396, 405, citing *Jordan v. Tashiro* (1928) 278 U.S. 123, 128 [73 L.Ed. 214] ["commerce" as used in treaty court "embraces every phase of commercial and business activity and intercourse"]; *Sun v. Taiwan* (9th Cir. 2000) 201 F.3d 1105, 1107-1108 [profit motive irrelevant to determination of whether Taiwan's activities were commercial]; *Siderman de Blake v. Republic of Argentina* (9th Cir. 1992) 965 F.2d 699, 708 ["activity need not be motivated by profit to be commercial"].) LSAC provides products and services for over 200 law schools and their applicants, including administration of the LSAT. Applicants seeking to gain entry into an ABA-approved law school must pay LSAC to take the LSAT, unless granted a fee waiver. LSAC administers about 100,000 tests annually. The fact LSAC does not make a profit at the end of the year does not render its activities non-commercial in nature. Moreover, with respect to reporting an applicant's LSAT score to law schools, LSAC can be said to act on behalf of the applicant, who is

26

seeking to engage in a commercial transaction with one of the law schools to which he or she applied.

Second, the intended audience is each law school receiving the LSAT score of an applicant who received additional testing time as an accommodation. These law schools are actual customers of LSAC's services and potential providers of the legal education the applicants wish to purchase. While each of the United States Supreme Court's decisions involving commercial speech "concerned a speaker engaged in the sale or hire of products or services conveying a message to a person or persons likely to want, and be willing to pay for, that product or service" (*Kasky*, *supra*, 27 Cal.4th at p. 960), here, we have a speaker engaged in providing admissions services, including the administration of the LSAT and provision of LSAT scores to law schools, conveying a message to these law schools concerning the scores of certain applicants, who are themselves seeking to purchase a legal education from those very law schools.

Third, the content of the message, i.e., that a particular LSAT score was earned with additional testing time and therefore not comparable to scores earned under standard time conditions, also supports the conclusion the speech is commercial in nature. As LSAC acknowledges, an applicant's LSAT score is an important factor law schools use to determine whether to enter into a commercial transaction with the prospective student. Moreover, flagging can be viewed as a statement about LSAC's services since LSAC is the entity that granted the applicant additional testing time on the LSAT, administered and scored the test, and conducted the research indicating scores earned with additional time are not comparable to scores earned under standard time conditions.

Thus, we conclude section 99161.5 is subject to intermediate scrutiny under *Central Hudson, supra,* 447 U.S. 557. This conclusion is bolstered by federal and California decisions relating to consumer credit reports. In *Greenmoss*, *supra*, 472 U.S. 749, a defamation case, the United States Supreme Court held a consumer reporting agency's credit report "was speech solely in the individual interest of the speaker and its

27

specific business audience," citing *Central Hudson's* description of commercial speech. (*Greenmoss, supra,* at p. 762.) The court explained the particular credit report at issue in the case, which was "wholly false and clearly damaging to the victim's business reputation," warranted no First Amendment protection. (*Ibid.*; see also *In re R.M.J.* (1982) 455 U.S. 191, 203 [71 L.Ed.2d 64] [false or misleading commercial speech is not entitled to First Amendment protection and "may be prohibited entirely"].) While the court was careful to point out it did not hold "that the report was subject to reduced constitutional protection because it constitutes economic or commercial speech," and its decision was based on the fact that the report's " 'content, form, and context' " indicated it was speech on a matter of purely private concern, the court also stated that "many of the same concerns that argue in favor of reduced constitutional protection" for commercial speech also applied to the credit report. (*Greenmoss*, *supra*, 472 U.S. at p. 762, fn. 8; see also *Hood v. Dun & Bradstreet, Inc.* (5th Cir. 1973) 486 F.2d 25, 30 [reduced constitutional protection for a consumer credit report "coincides with the doctrine of commercial speech"].) Outside the defamation context, lower federal courts have treated consumer credit reports and related forms of expression either as commercial speech (see *Millstone v. O'Hanlon Reports, Inc.* (8th Cir. 1976) 528 F.2d 829, 833) or as being subject to the same level of protection as commercial speech (see *Trans Union Corp. v. Federal Trade Com.* (D.C. Cir. 2001) 245 F.3d 809, 818; *Individual Reference Servs. Group, Inc. v. Federal Trade Com.* (D.D.C. 2001) 145 F.Supp.2d 6, 40-41).

Noting these decisions, our colleagues in the Second District Court of Appeal assumed for purposes of discussion that a consumer credit report was commercial speech and applied the *Central Hudson* test to assess the constitutionality of a statute allowing California consumers to "freeze" their credit reports. (*U.D. Registry, Inc. v. State of California* (2006) 144 Cal.App.4th 405, 422.) There, the plaintiff sold credit reports to its members, "landowners, property managers, and others," who "consider[ed] the reports in deciding whether to lease real property to prospective tenants." (*Id*. at p. 410.) The

28

Court of Appeal explained these reports "benefit consumers by facilitating the extension of credit" and "benefit lessors by identifying potential lessees who are bad credit risks." (*Id*. at p. 423.) Like a credit report, the LSAT score reports at issue in this case benefit applicants with high scores by facilitating the extension of an offer of acceptance, which ultimately leads to an economic transaction between the applicant and the law school. And like a bad credit score identifies credit risk, a lower LSAT score identifies applicants who are less likely to do well in their first-year courses, information law schools use in deciding whether to offer admission to, and thereafter enter into a commercial transaction with, prospective law students.

Finally, like a credit report, an LSAT score report "does not involve any matter of public concern, but consists of information of interest solely to the speaker and the client audience." (*Individual Reference Servs. Group, Inc. v. Federal Trade Com.*, *supra*, 145 F.Supp.2d at p. 41.) Thus, even if the information LSAC provides to law schools in connection with these score reports "is not commercial speech *per se*, it is entitled to the same level of protection." (*Ibid*.)

### 2. *Commercial Speech Analysis*

"For commercial speech to come within [the First Amendment's protection], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." (*Central Hudson*, *supra*, 447 U.S. at p. 566.) However, "[t]he court has clarified that the last part of the test—determining whether the regulation is not more extensive than 'necessary'—does not require the government to adopt the least restrictive means, but instead requires only a 'reasonable fit' between the government's purpose and the means chosen to achieve it. [Citation.]" (*Kasky*, *supra*, 27 Cal.4th at p. 952.) The State bears

29

the burden of justifying section 99161.5's restriction on LSAC's speech. (See *Board of Trustees v. Fox* (1989) 492 U.S. 469, 480 [106 L.Ed.2d 388].)

The State asserts LSAC's practice of flagging the LSAT scores of applicants who were given additional time as an accommodation fails the first stage of the analysis because it "violates the ADA, in particular 42 U.S.C. §§ 12189 and 12203, and the Unruh [Civil Rights] Act, pursuant to Civil Code section 51, subdivision (f)."[7] The State offers no argument in support of this assertion. We therefore consider it forfeited. (*Americas Propane, LP v. Landstar Ranger, Inc.* (2010) 184 Cal.App.4th 981, 1001, fn. 4; *People v. Stanley* (1995) 10 Cal.4th 764, 793.) In any event, the United States Court of Appeals for the Third Circuit has held that "flagging does not constitute an ipso facto violation of Title III of the ADA." (*Doe v. National Bd. of Med. Exam'rs* (3d. Cir. 1999) 199 F.3d 146, 149.) However, the court also explained flagging a particular test score could violate the law if the applicant "were to establish either that his [or her] scores are psychometrically comparable to the scores of candidates who take the test under standard time conditions, or that his [or her] scores will be ignored by the programs to which they are reported." (*Id*. at pp. 156-157.) Section 99161.5, subdivision (c), prohibits LSAC from flagging *any* LSAT score that was earned with additional testing time. Thus, in order to establish *all* such flagging violates the ADA, and is therefore entitled to *no* commercial speech protection, the State would have to show *all* LSAT scores earned with additional testing time are psychometrically comparable to the scores of candidates who take the LSAT under standard time conditions or that *all* of LSAC's member law schools ignore flagged scores. The State has made no such showing in opposition to LSAC's preliminary injunction motion. We express no opinion on whether it will be able to do so at trial.

---

[7] Civil Code section 51, subdivision (f), states: "A violation of the right of any individual under the [ADA] shall also constitute a violation of this section."

30

The second stage of the *Central Hudson* analysis requires us to consider whether the State's asserted interest in enacting section 99161.5 is substantial. (*Central Hudson*, *supra*, 447 U.S. at p. 566.) We conclude it is. As mentioned, the Legislature's purpose in enacting section 99161.5, including the anti-flagging provisions of subdivision (c), was to prevent disability discrimination in the law school admissions process. The State has a compelling interest in ensuring prospective law students have a full and equal opportunity to compete for admission to the law schools of their choice irrespective of the applicant's physical or mental disability. (See *North Coast Women's Care Medical Group, Inc. v. Superior Court* (2008) 44 Cal.4th 1145, 1158 [Unruh Civil Rights Act's prohibition against sexual orientation discrimination "furthers California's compelling interest in ensuring full and equal access to medical treatment irrespective of sexual orientation"].)

In the third stage of the analysis, we consider whether section 99161.5 directly and materially advances the State's interest in preventing disability discrimination in the law school admissions process. (*Central Hudson*, *supra*, 447 U.S. at p. 566.) The United States Supreme Court has stated: "The third part of the *Central Hudson* test asks whether the speech restriction directly and materially advances the asserted governmental interest. 'This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.' [Citation.] Consequently, 'the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.' [Citation.]" (*Greater New Orleans Broad. Assn. v. United States* (1999) 527 U.S. 173, 188 [144 L.Ed.2d 161].) We first note the obvious: if flagging an LSAT score that was earned with additional time contributes to disability discrimination in the law school admissions process, then prohibiting the practice will materially alleviate this harm. The question, then, is whether such discrimination is real or speculative. Again, the State bears the burden of showing the harm is real.

31

Based on the record developed on the preliminary injunction motion, we cannot conclude the State has carried this burden. However, nor can we conclude the State will be unable to do so at trial. As mentioned, in opposition to LSAC's preliminary injunction motion, the State submitted the report of the ABA's Commission on Disability Rights. With respect to flagging, the report concluded: "[W]hen an accommodated score is labeled as 'nonstandard' or when a testing agency tells the academic program that the score does not conform to the scores of students who were not given accommodations, the student with the accommodated score is placed at a serious disadvantage. There are serious policy, ethical, and social problems involved with flagged scores, including disregard for an applicant's desire not to have his or her disability revealed and the potential attachment of a stigma during the admission process." The report then reviewed the findings of a blue ribbon panel of experts that was convened as part of a settlement agreement reached in a federal case challenging ETS's prior practice of flagging SAT scores, *Breimhorst v. Educational Testing Services* ((N.D.Cal. 2000) Case No. C-99-3387 [WL34510621]).

Based on scientific, psychometric, and social evidence submitted by the parties, the blue ribbon panel concluded flagging SAT scores should be discontinued as discriminatory. (Gregg, et al., *The Flagging Test Scores of Individuals with Disabilities Who Are Granted the Accommodation of Extended Time: A Report of the Majority Opinion of the Blue Ribbon Panel on Flagging* (2002), p. 2.) With respect to the scientific evidence, the panel found that "in order to be treated fairly and equally, and to have opportunities to pursue higher education, students with reading disabilities must have the accommodation of extra time. As there is strong scientific evidence that [reading] fluency is the core of the disability for the majority of students with learning disabilities, to require flagging of this needed accommodation and no other accommodation, discriminates against a specific group of individuals." (*Id*. at pp. 3-4.) At the same time, based on the psychometric evidence, the panel found "no evidence to

suggest that the magnitude of the overall difference in predictive validity between standard and extended time administration warrants a cautionary flag to be attached to the scores of students who took the test under the condition of extended time." (*Id*. at p. 8.) Finally, with respect to the social evidence submitted by the parties, the panel concluded: "Many students are reluctant to request extended time on the [SAT] because the presence of the flag forces them to reveal a disability. Since the overwhelming majority of students who request extended time demonstrate learning disabilities, the presence of a flag denotes a specific characteristic of the examinee ― a learning disability. The detrimental effect of such a designation is further supported by findings that students with learning disabilities with flagged scores are under admitted to colleges. Thus, flagging appears to single out and treat the group with learning disabilities unequally, to diminish fair chances for college admission, and to discourage the use of a mandated ADA accommodation; together, these scientific and ethical factors speak to the necessity of removing the flag." (*Id*. at p. 10.)

Here, the State did not submit similar evidence showing the flagging of LSAT scores earned with additional testing time causes similar harm to prospective law students with disabilities, e.g., by discouraging such students from applying for additional testing time and depriving them of equal access to law school admission and future entry into the legal profession. However, while the State bears the burden of proving the harm caused by flagging *at trial*, on appeal from the grant of a preliminary injunction, the State need only show the trial court abused its discretion in granting the preliminary injunction. Based on the evidence the State did submit regarding the harm caused by flagging on the SAT, we conclude it would have been an abuse of discretion for the trial court to have found the State would not likely be able to submit sufficient evidence that flagging LSAT scores earned with additional time causes similar harm to prospective law students with disabilities.

Finally, there must be a "reasonable fit" between the State's interest and the means chosen to achieve it.  (*Board of Trustees v. Fox*, *supra*, 492 U.S. at p. 480.)  Stated differently, the fit must be "one whose scope is in proportion to the interest served." (*Greater New Orleans Broad. Assn. v. United States*, *supra*, 527 U.S. at p. 188.) Assuming the State is able to demonstrate the harm caused by flagging is real, we conclude prohibiting LSAC from flagging LSAT scores earned with additional time is proportionate to the State's compelling interest in preventing disability discrimination in the law school admissions process.

LSAC disagrees, relying on *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525 [150 L.Ed.2d 532] (*Lorillard*).  There, the United States Supreme Court held the "broad sweep" of Massachusetts regulations prohibiting the outdoor advertising of cigars and smokeless tobacco within a 1,000-foot radius of a school or playground indicated the Massachusetts Attorney General "did not 'carefully calculate the costs and benefits associated with the burden on speech imposed' by the regulations."  (*Id*. at p. 561.)  The court explained the regulations would "prohibit advertising in a substantial portion of the major metropolitan areas of Massachusetts," and in some areas "would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers."  (*Id*. at p. 562.)  The court concluded:  "The State's interest in preventing underage tobacco use is substantial, and even compelling, but it is no less true that the sale and use of tobacco products by adults is a legal activity.  We must consider that tobacco retailers and manufacturers have an interest in conveying truthful information about their products to adults, and adults have a corresponding interest in receiving truthful information about tobacco products.  In a case involving indecent speech on the Internet we explained that 'the governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults.'  [Citations.]  As the State protects children from tobacco

34

advertisements, tobacco manufacturers and retailers and their adult consumers still have a protected interest in communication." (*Id*. at p. 564.)

LSAC argues that, like the tobacco retailers and manufacturers in *Lorillard, supra,* 533 U.S. 525, it has an interest in conveying truthful information about the LSAT scores it reports to law schools, and these law schools, like the adult tobacco consumers in *Lorillard*, have a corresponding interest in receiving truthful score information. We are not persuaded by this analogy. As stated, the regulation at issue in *Lorillard* was designed to protect children from exposure to tobacco advertising, but swept so broadly it prevented adults from receiving such advertising messages in a substantial portion of Massachusetts. Here, section 99161.5 is designed to protect law school applicants with disabilities from being discriminated against in the law school admissions process. Assuming the State is able to carry its burden in the third stage of the *Central Hudson* analysis (*supra,* 447 U.S. 557) by showing that flagging LSAT scores causes real discriminatory harm to prospective law students with disabilities, section 99161.5 sweeps no more broadly than necessary to alleviate this harm.

Based on the current record, we cannot hold as a matter of law that section 99161.5 survives LSAC's free speech challenge. However, based on the evidence that is before us, we conclude LSAC has not demonstrated a sufficient likelihood of prevailing on this claim to warrant the trial court's issuance of the preliminary injunction. In so concluding, we note again that a "trial court's determination [to grant a preliminary injunction] must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction. [Citation.]" (*Butt v. State of California*, *supra*, 4 Cal.4th at p. 678.) Because LSAC's likelihood of prevailing on its free speech claim is uncertain, in order for us to conclude the trial court did not abuse its discretion in issuing the injunction, LSAC's showing on the interim-harm factor must be strong. As we explain later in this opinion, the balance of interim harm does not favor LSAC.

35

## C.

### *Special Legislation*

Article IV, section 16, provides that "[a] local or special statute is invalid in any case if a general statute can be made applicable." (Art. IV, § 16, subd. (b).) Like the equal protection clause discussed above, this provision of the California Constitution "embod[ies] the principle of equality before the law." (*Whittaker v. Superior Court* (1968) 68 Cal.2d 357, 368.) Accordingly, the test for determining whether a statutory classification violates this provision is "substantially the same" as that used to determine constitutionality under the equal protection clause. (*County of Los Angeles v. Southern California Tel. Co.* (1948) 32 Cal.2d 378, 389.)

"[A] law is a general one when it applies equally to all persons embraced in a class founded upon some natural, intrinsic, or constitutional distinction; on the other hand, it is special legislation if it confers particular privileges, or imposes peculiar disabilities or burdensome conditions, in the exercise of a common right, upon a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law. [Citations.] Under this rule, it is apparent that the constitutional prohibition of special legislation does not preclude legislative classification but only requires that the classification be reasonable. [Citations.]" (*People v. Western Fruit Growers* (1943) 22 Cal.2d 494, 506.) Thus, "the mere production of inequality which necessarily results to some degree in every selection of persons for regulation does not place the classification within the constitutional prohibition. The discrimination or inequality produced, in order to conflict with [either the special statute or equal protection clauses] must be 'actually and palpably unreasonable and arbitrary,' or the legislative determination as to what is a sufficient distinction to warrant the classification will not be overthrown. [Citations.] When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of

36

existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification.  [Citations.]"  (*Id*. at pp. 506-507.)

For the reasons expressed in the portion of this opinion addressing LSAC's claim that section 99161.5 violates the equal protection clause, we also conclude as a matter of law that this section does not constitute an invalid special statute.  Simply put, the Legislature did not "arbitrarily select[] [LSAC] from the general body of [test sponsors] who stand in precisely the same relation to the subject of the law."  (*People v. Western Fruit Growers*, *supra*, 22 Cal.2d at p. 506.)  As we have explained, LSAC is not similarly situated to these other test sponsors.

### D.

### *Bill of Attainder*

"A bill of attainder is a legislative act that inflicts punishment without a judicial trial."  (7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 205, p. 343.)  Such a law is prohibited by article I, section 9 of the California Constitution.

"[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."  (*United States v. Lovett* (1946) 328 U.S. 303, 316 [90 L.Ed. 1252].)  "In deciding whether a statute inflicts forbidden punishment, [the United States Supreme Court has] recognized three necessary inquiries:  (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'  [Citation.]"  (*Selective Service System v. Minnesota Public Interest Research Group* (1984) 468 U.S. 841, 852 [82 L.Ed.2d 632].)

LSAC argues section 99161.5 "applies with specificity only to LSAC" and "punishes LSAC by making LSAC the only test sponsor subject to its requirements and

37

limitations, on pain of incurring civil penalties for non-compliance." Not so. Section 99161.5 applies to "[t]he test sponsor of the [LSAT]." (§ 99161.5, subd. (a).) At present, the only such sponsor is LSAC. However, as previously explained, should additional companies become test sponsors for the LSAT, section 99161.5 would also apply to these sponsors. In any event, even if the specificity element were deemed satisfied, the requirements of section 99161.5 can in no way be considered punishment.

## III

### *Balance of Interim Harm*

As mentioned, a trial court's decision to grant a preliminary injunction "must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction. [Citation.]" (*Butt v. State of California*, *supra*, 4 Cal.4th at p. 678.) However, "[a] trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim." (*Ibid*.) Having concluded, as a matter of law, that section 99161.5 does not violate LSAC's right to equal protection, constitute an invalid special statute, or amount to a prohibited bill of attainder, the only claim on which LSAC has a possibility of prevailing is the free speech claim. Even with respect to this claim, we concluded LSAC's prospects are uncertain. We now conclude LSAC has not demonstrated sufficient interim harm to justify the trial court's decision to issue the preliminary injunction.

LSAC argues the trial court correctly determined "the risk of infringement of [LSAC's] constitutional rights is sufficient harm to warrant injunctive relief." As mentioned, this determination was based on the erroneous view that LSAC would likely prevail on its equal protection claim. But because "we review the correctness of the trial court's ruling, not its reasoning" (*Oiye v. Fox*, *supra*, 211 Cal.App.4th at p. 1049), we must determine whether the possibility of LSAC prevailing on its free speech claim, and

38

the concomitant smaller risk of infringement of LSAC's constitutional rights, is sufficient harm to sustain the preliminary injunction. We first note we cannot conclude "simply because [section 99161.5] affects the right of free speech, its enforcement results invariably in such a deprivation of rights that no consideration need be given to the degree of deprivation caused or the effect of enjoining the enforcement of the [statute]." (*Sundance Saloon, Inc. v. City of San Diego* (1989) 213 Cal.App.3d 807, 817.)

We also note the dependent nature of the interim-harm analysis, particularly in this case, where the question of whether section 99161.5 survives intermediate scrutiny as a restriction on commercial speech turns on the State's ability to prove LSAC's policy of flagging causes real discriminatory harm to prospective law students with disabilities. If the State ultimately carries this burden, but is enjoined in the meantime from enforcing a constitutional statute that protects law school applicants with disabilities, these applicants will suffer tremendous irreparable harm. They will be faced with the concrete and immediate choice of either having the fact of their disability disclosed to law schools or foregoing the opportunity to have a needed accommodation on the LSAT. If they choose the latter, they risk earning a score that reflects their disability rather than their aptitude to study the law. If they choose the former, they risk having law schools discount their LSAT scores as "not hav[ing] the same meaning as scores earned under standard time conditions." Once the score report is sent to law schools, the consequences are irrevocable. Conversely, if the State does not carry its burden at trial, and LSAC is prevented in the meantime from releasing truthful information to law schools regarding LSAT test scores, then commercial expression serving the economic interest of LSAC and assisting law schools in their admissions decisions will have been suppressed. The free flow of commercial information is important. Nevertheless, the interim harm to law school applicants with disabilities that will result if the State carries its burden outweighs that of LSAC if the State fails in this regard.

39

Because LSAC's likelihood of prevailing on the merits of its free speech claim is, at best, an uncertain proposition, and because the balance of interim harm favors law school applicants with disabilities, we conclude it was an abuse of the trial court's discretion to issue the preliminary injunction.

## DISPOSITION

The order granting the preliminary injunction is reversed with directions to enter a new order denying the injunction.  The stay granted by writ of supersedeas is dissolved.  Each party shall bear its own costs on appeal.


                                        _____HOCH_____, J.



We concur:



_____ROBIE_____, Acting P. J.



_____BUTZ_____, J.